28565.   HAMPTON *v.* MACON NEWS PRINTING COMPANY.

DECIDED DECEMBER 5, 1940.   REHEARING DENIED DECEMBER 19, 1940.

*Jones, Jones & Sparks, Johnston & Jones,* for plaintiff.
*Harris, Harris, Russell & Weaver, Harry S. Strozier,* for defendant.

SUTTON, J.   Mrs. R. L. Hampton brought suit against the Macon News Printing Company to recover for injuries sustained by her through the negligent operation of a motorcycle by one Gregory Elmore, who, it was alleged, was the agent of the defendant, then and there acting within the scope of his employment in delivering newspapers for the defendant on a rural route. The defendant answered and set up, among its defenses, that Elmore was an independent contractor for whose acts it was not responsible and denied that he was an employee. On the trial of the case the court, on motion of the defendant, directed a verdict in its favor. While the ground of the court's order is not shown, it is conceded by both parties that the court's action was based on the theory that the

alleged agent was in fact an independent contractor. The plaintiff's motion for new trial was overruled, and the exception here is to that judgment, and the only question presented, as admitted by counsel for both parties, is whether or not Gregory Elmore was, at the time of the injury to the plaintiff, a servant of the defendant or an independent contractor.

The following case is substantially made by the record: On November 2, 1937, Elmore, while operating a motorcycle and delivering the evening edition of the Macon Evening News, an afternoon newspaper published by the defendant, ran into an automobile being driven by the plaintiff, and as a result of the collision the automobile turned over and the plaintiff sustained certain personal injuries. On the question of the status of Elmore the evidence shows that the defendant publishes an afternoon newspaper, called the Macon Evening News, which is distributed (1) by delivery through the United States mails, (2) by sale at news stands, hotels, and by street hawking, and (3) by newsboys to local subscribers. Newsboy delivery is made both within the city and outside of it on routes assigned to different boys. No written contract was entered into between the defendant and the carrier in the present case. He simply took over a route which had been developed by another boy before him, and the defendant accepted him as a carrier. The newsboys bought on credit the number of papers necessary for subscribers on their particular routes and at a price fixed by the defendant. In the sale of papers to the boys the defendant used a different cost scale, depending on whether the route was within or without the city. For papers to be delivered within the city limits the defendant charged the boy 11 cents per week per subscriber, and the boy was paid by the subscriber 20 cents per week. On routes in the rural districts the company charged the boys on some routes 3 cents per week for papers and on other routes 4 cents, the charge to Elmore on his route being 4 cents, the price to the subscriber being fixed by the company at 20 cents, the same as paid by city subscribers. These city and rural routes are divided into districts, and the defendant appoints a district supervisor or manager, who engages and discharges the carriers. As a part of their work, the carriers solicit subscriptions. The company keeps no list of subscribers, but keeps an account of the charges for the papers against each carrier, and the account is balanced off by a

settlement at the end of each week, the carrier retaining the difference between the amount of the total sales and the amount of the total charges. Where the amount of a subscription is paid in advance by a subscriber to the newspaper company, the sum is held by the company, but the carrier is credited each week as if 20 cents had been paid direct to him by the subscriber, and he is debited with his usual charge. Where the amount is for more than a week, for example, for a year, and is less than would be the total amount figured at 20 cents per week, the difference is absorbed by the company, and the carrier makes his usual profit. When a subscription is 'phoned in it is assigned to the carrier for the route on which the subscriber lives. If a subscriber notifies the company that a paper has not been received, and if he lives in the city and is easily accessible, the company sends a paper to him and charges the carrier a dime. If the subscriber lives without the city, the company tries to locate the carrier and have him deliver the paper. If the carrier is not located, the company may or may not send out a paper, depending on the difficulty and trouble involved. Elmore had about 100 customers. If payments were not made when due, he could discontinue deliveries to a delinquent. He could get as many new ones as he could, and was under no obligation to report the names to the company. Every afternoon he would go to the defendant's place of business and get the papers he was to deliver. They were received in bulk by him. No customers' names were shown thereon. These names were noted in a book of his own. The motorcycle he used was his own. He paid for the necessary gasoline and bought when and where he pleased. He chose the beginning point of his rural route, chose such roads as he pleased, and varied his route according to the weather. He went unattended by a representative of the defendant, his delivery of papers to his customers not being supervised or interfered with. Elmore had to pay the defendant for every paper he received. If a subscriber failed to pay, the loss was Elmore's.

The Georgia Industrial Home bought papers on a monthly or quarterly basis and Elmore handled this subscription. Prior to August, 1938, it was billed for its subscription on a billhead of the defendant, operating the Macon Evening News, and these bills were paid by the subscriber by checks payable to the order of the Macon Evening News. Beginning with August, 1938, the com-

pany wrote with typewriter across its billhead "Please make check payable to carrier," and named the carrier to whom the money was to be paid. Thereupon the checks were made payable to the carrier. It was testified on behalf of the defendant that the practice of sending out statements, made on its billheads, was merely a service to the carriers. A. G. Laney, who was a collector for the Macon Telegraph, under the same management as the defendant, collected or accepted from T. A. Jacobs the price of a subscription to the Macon Evening News. This money was not turned over to the carrier but to the defendant, but was credited to the carrier by the defendant in the usual manner hereinbefore stated. In 1938 the Macon Evening News put on an extensive drive to secure subscriptions, and inserted advertisements in its papers which carried a subscription blank which was not addressed to the carrier but to the newspaper. Above the subscription blank appears what purports to be a message from a newsboy requesting the reader to fill in the blank and thus aid him to win a prize for a Bantam roadster offered by the newspaper to the carrier obtaining the most new subscriptions. The blank is addressed to the paper and the subscriber who is to sign makes the statement that the subscription is made to assist the carrier to win the prize, and it concludes with the words "This subscription secured by————————carrier." After the injury to the plaintiff the carrier ceased to deliver papers. She received a paper the day following the accident, but a period of ten days elapsed before she received another, and only after she 'phoned the circulation manager her complaint, who stated to her "Well, I can't understand why you don't have your paper as we have a new boy on the route. We had an accident out there. We had a bad wreck out there. We have a new boy and we will see that you get your paper." A Mr. Robert Horne, a former news carrier, and an attorney at the time of the trial, was at the time of the injury to the plaintiff one of the defendant's district managers of newspaper routes, but his district was in the East Macon vicinity, far removed from Elmore's route, and Elmore was not under his jurisdiction or supervision. Horne had full authority to engage and discharge the newsboys who worked in his district. He furnished a list of subscribers when a new boy took over a route, taught the route, showing where the subscribers lived, gave the carrier a receipt book in which to keep a record of papers paid for, and supplied extra papers

which the carrier might sell to others than regular subscribers. The carriers were directed to secure new subscribers, and, if a boy's work was not satisfactory, Horne had authority to replace him in his district. He testified that "If the paper tried to make the boy sell to people who wouldn't pay, a lot of times he wouldn't do it. In the final analysis, that boy had the right to determine whether or not he was going to give a man a paper or not." The boys were required to pick up papers for delivery at a certain time and to be delivered within a period prescribed by the company. The routes were not subject to sale or transfer to new boys by the carrier except with the company's approval of the successor newsboy. It was shown that on different occasions, upon complaint of the post-office department, the district supervisor exercised a right of requiring the carriers to cease putting the papers in mail boxes.

The above evidence is sufficiently comprehensive to afford a determination of the question here raised, viz., whether Elmore was an independent contractor or an employee of the defendant. The plaintiff in error contends that the purported sale of papers to Elmore was not a genuine sale, and that only the relationship of master and servant existed, the newspaper retaining the right to control the time, method, and manner of his work, and that the trial court erred in directing a verdict for the defendant. The defendant in error contends that the evidence shows conclusively that Elmore was what is known in newspaper parlance as a "small merchant," and was in law an independent contractor.

The following is the opinion of the other two members of this court, from which I dissent for the reasons hereinafter shown in my dissenting opinion:

The defendant's sole insistence upon the correctness of the ruling of the trial judge in directing a verdict for the defendant is that it appears conclusively from the evidence that the newsboy who was engaged in delivering the defendant's newspapers, and who at the time ran into the car of the plaintiff and injured her, was an independent contractor, and was not at the time the servant of the defendant. Whatever the relationship between the defendant and the newsboy was, his duties were to deliver daily issues of the newspaper published by the defendant to definite subscribers of the newspaper, whether these subscribers had contracted with the newsboy or had contracted with the defendant for the delivery of papers

to them. If the defendant, under the contract with the newsboy, had authority to control the time, manner, method, and means by which the newsboy performed his duties of delivering papers to subscribers, the relationship was that of master and servant between them, or if the contract only required the newsboy to produce results by delivering the papers to the subscribers by such means, manner, and methods as he should provide, and the defendant had no authority to direct the manner, means, time, and method by which the newsboy should perform the work, the relationship would be that of independent contractor. In the first case the defendant would be responsible for the newsboy's tortious acts committed while in the execution of the contract in delivering the papers. In the latter case the defendant would not be responsible for the newsboy's tortious acts committed in the execution of the contract in delivering such papers of the defendant. The question whether the newsboy was a servant of the defendant or an independent contractor must be determined by the terms of the contract between the parties. If the terms of the contract do not appear, then they may be inferable by the conduct of the parties in the performance of the contract.

There appears no written contract specifically defining the rights and duties of the parties thereto. The newsboy was engaged under an oral contract only. It appears from the evidence that the defendant "sold" and furnished daily issues of its newspaper to the newsboy at a certain weekly price fixed by the defendant, and that the newsboy resold the papers on a more or less definitely defined territorial route to various subscribers of the paper, and daily delivered issues of the paper to such subscribers; that where the route was more or less difficult to travel and the subscribers more or less scattered, as in the country routes as contrasted with the city routes, the defendant charged the newsboys less for the papers than it charged the newsboys in the city routes, but the price of the papers to the subscribers in both the country and city routes was, as fixed by the defendant, the same. So far as it appears from the evidence the defendant did not merely sell its newspapers to the newsboys for resale and delivery by them to definitely ascertained subscribers and turn its back on the newsboys and leave them to secure the results, namely, delivery of the papers to the subscribers, but the defendant was constantly on the alert to see, and went so

far as to see, that the boys produced results by the delivery of the papers. While this was not inconsistent with the relationship of employer and independent contractor between the defendant and the newsboys, it appears from the evidence that the defendant went further and in instances undertook to direct how and in what manner a newsboy should make deliveries of the papers; that upon an occasion when the defendant was remonstrated with by the Federal postal authorities as to the practice of the newsboys in putting the papers in mail boxes, the defendant directed the newsboys not to do this, and that when a newsboy failed to make delivery of a paper on any occasion the defendant would, upon complaint by the subscriber, where it was feasible and possible, direct the newsboy, or some other person, specifically to take the paper to the subscriber. It appears from the evidence that on occasions when the subscribers failed to pay the newsboys for the papers the defendant billed the subscribers as debtors to it. It appears that prior to the accident checks had been received by the defendant from subscribers on the newsboy's route payable to the defendant for subscriptions to its paper, which checks were received and cashed by it. It further appears that this system continued for a time after the accident; that thereafter the defendant changed such system and required checks for subscriptions to its paper to be made payable to the newsboy in charge of the particular route in which the subscriber resided. It also appears from the evidence that after the accident cards, which, it is inferable, were issued by the defendant and delivered to the newsboys for delivery to subscribers, were delivered to the subscribers, that on these cards appeared a statement purporting to be from the newsboy to the effect that he was in business for himself, that his capital was very small, and that he bought his papers from the defendant and sold them to the subscribers.

Robert Horne who had been a newsboy for the Macon News and had worked up to a district route manager, but who at the time was not in the employ of the company, testified in part as follows: "I know how the Macon News Company handled the distribution and sale of their newspapers. At that time [about the time he left the Macon News, which was in April, 1937, shortly prior to the accident in November, 1937] they would sell newspapers to a boy each week. . . That price [referring to the price of twenty

cents a week for the daily and Sunday paper charged a subscriber] was fixed by the Macon News and not by the carrier. . . The paper boy collected this 20 cents and he had to pay eleven cents into the paper and the nine cents went for his profit. . . As to who employed or made the arrangement or control or agreement with the news carrier when he started working for the Macon News, all this was done by the district manager in each district. Over in my district I would make the agreements with them. I had authority from the company to make the agreement. I got rid of them. As to how I got rid of them, I would discharge them when they did not carry out their duties. I had authority from the company to do that. As to just what my authority with reference to arranging for and getting rid of these boys was, I hired the boys at will and discharged them at will. As to who determined the route that these boys carried papers over, the News itself had set out definite routes several years before I went to work for them. . . But each route was supposed to have a certain territory. . . The contract that was made with the boys who I hired was oral most of the time. . . There was no written contract entered into between me and any of the boys. I never heard of any written contract with the boys. I never saw a written contract signed by any of them. When these carriers are engaged they are given a list of subscribers and taught the route and shown where the people live who were already taking the paper. They would give them a book with the persons' names in it to show whenever any one paid. . . The boys were supposed to go out and get subscribers of their own. The paper pushed them very much for subscriptions. As to what would happen to subscriptions that came in over the 'phone, most of the time when any one 'phoned in and wanted to start taking the paper they would determine what route the street was on and they would give the boy a notice to start the paper and they would raise his number of subscriptions by one. As to whether he would have any choice whether he would deliver that paper or not, sometimes he would kick on it. Maybe they would owe him some money or something and he would kick on it. . . As to whether they had a right to require him to take it, I don't know whether they did. They did, however, as a matter of fact, require him sometimes to deliver papers. . . It was a part of the duty of a sub-station manager or district manager to

supervise the route, check up on subscriptions. I went out on my route very much. A lot of times I would go out and go with the boys. Most every evening I went out with them, and sometimes if a boy was sick or something I would throw the route myself. If a boy was discharged and the route was in debt I would most of the time take it and work it out of debt and kind of build it back up. If a boy did not manage the route satisfactorily to me I would discharge him. . . I supervised the collection of their debit. The district manager was supposed to see that the money was paid, and most of the time I collected the money out of the paper boy. . . The bills for quarter, semi-annual, and annual payments which the carriers took around are made out by the Macon News. . . The news carrier got these any time he wanted to. The paper usually kept a record of it. They would be turned over to the district manager, and the district manager would in turn turn it over to the paper boy. The paper boy would collect it and bring the money back into the paper or to the district manager. If a boy wanted to quit the route . . I would go out and get some-body else to take his route. . . If a boy was selling twenty people newspapers and he got ready to quit, and he had some newspapers he had not delivered, I took it out of his deposit. . . If the paper tried to make the boy sell to people who wouldn't pay, a lot of times he wouldn't do it. In the final analysis that boy had the right to determine whether or not he was going to give a man a paper or not. . . I did not give the boy cards so he could tell the customer what the relation between the boy and the customer was. That relation was printed on the back of the card. . . It addresses the customer as follows: 'Dear Customer. Do you know I am in business for myself, and that my capital is very small? I buy my week-day and Sunday papers that I deliver to you from the Macon News and then sell them to you.' That was the relation. He bought the paper for eleven cents a week and sold it to his customer for twenty cents a week. However, that is not the only thing the Macon News had to do with the whole transaction. They had other supervision over them. They made them come down and go to work at a certain time. They had a time that the paper had to be picked up and carried out on the route. A lot of times they would put on a contest and tell them they would have to get so many new subscribers in this contest, else they would not give

them any more papers. . . So far as my supervision or control or watching over these newsboys, there was no difference between those in the city and those in the country. They were all the same. We could not get out on the country route as much as we could here in town and supervise as much as we could in town, but every time anything went wrong we would get after them. I know on one or two occasions the boys on the country route would put papers in mail boxes, and the post-office inspector would 'phone some of the high authorities of the paper, and they would see me about it and I would in turn get after the country route boy about it. I would tell him how to deliver it and tell him what to do with it and where to put it, where not to. I told him not to put it in the mail boxes. . . I never heard of a newsboy selling his route to another one. I wouldn't allow it in my district. Nobody worked except who I said worked."

J. T. Webb Jr., a witness for the defendant testified as follows: "In the case of an annual subscriber who sends in his check in advance we consider the News is obligated to get that paper to that subscriber. The only way we have of getting that paper to the subscriber is by the newsboy on the route. When the newsboy brings that subscriber the paper he does it because we give him the subscriber's name. We, of course, could not give him the subscriber's name if we did not have a record of it in our office, and that is true of all the other 25 or 75 annual subscribers. It is pretty generally true of our six-months subscribers. Our records do not show whether there were any subscribers on Elmore's route who paid in advance. We do not take the position that a newsboy on some particular route under this general arrangement is an employee of the company and another one on the route next to him is not an employee. We consider all of the newsboys for the Macon News as occupying the same general classification. So far as our rule or general method of doing business is concerned, it applies the same to all of our newsboys, subject to such conditions as may result from the fact that one is a rural carrier and the other city carrier and things of that sort." It is inferable from this testimony that the defendant, through its supervisor and district manager, exerted control over the time, method, manner, and means by which the newsboys performed their duties and delivered papers to the defendant's customers. It appears from the evidence that

the defendant asserted the right to discharge, upon any grounds it saw fit, a newsboy to whom it had "sold" papers for "resale" and delivery to subscribers to the defendant's paper upon a definite route. It is inferable from the evidence that the defendant, in so far as it appears from the contract, which was oral and undefined, had the right to fire the newsboy if the newsboy at any time failed to comply with any order or direction of the defendant. It is inferable that this necessarily included any order or direction as to the method, time, manner, and means of performing the work. If the relationship between the parties was that of an independent contractor, manifestly the defendant would have no right to direct and control the manner, method, means, or time of the performance by the newsboy of the work, and would have had no right to fire the newsboy for a failure to comply with such orders and directions from the defendant. If the defendant had the right to fire the newsboy for any reason which the defendant saw fit, it would certainly have the right to fire him for failure to follow any directions which the defendant might see fit to give as respects the time, manner, method, and means of the performance of the work.

In Globe Indemnity Co. v. Industrial Acc. Com., 208 Cal. 715 (284 Pac. 661), which was a case where a newsboy working under a situation similar to that in the present case sought compensation against his employer, a newspaper, the Supreme Court of California held that where the newspaper had unlimited right to discharge the newsboy and could do so for failing to obey any instructions from it, the Industrial Accident Commission of that State was authorized to find that the relationship was that of master and servant. In the opinion in that case the court said: "It is clear from the record in the present case that the evidence sustains the conclusion that the Tribune Publishing Company could discharge Fred [the newsboy] at any time, and that if given any instructions, they would have to be followed by Fred at the risk of being discharged if he refused or failed to comply with them, and that, therefore, the right of control existed within the meaning of the test stated by the authorities cited." One of the authorities cited by the court, as appears from the opinion, held that "One of the means of ascertaining whether or not the right to control exists is the determination of whether or not, if instructions were given, they would have to be obeyed." Press Publishing Co. v. Industrial Accident Com., 190 Cal. 114 (210 Pac. 820).

We do not think that this case is distinguishable from the case at bar. In the case at bar, instead of being paid a fixed amount to cover the extra expense of delivery, the newsboy was charged a smaller sum for each paper, which to all intents and purposes is the same thing done in a different way. Below is a comparison of the substantial facts in the two cases:

| GLOBE IND. CO. *vs.* INDUSTRIAL ACCIDENT CO. | MRS. R. L. HAMPTON *vs.* THE MACON NEWS PRINTING CO. |
|---|---|
| (1) Oral contract very meager as to terms. | (1) Same. |
| (2) Bond guaranteeing payment for paper. | (2) Same. |
| (3) Papers sold to carrier at specified price and sold by carrier to subscriber at price fixed by the company, the difference representing carrier's profit. | (3) Same. |
| (4) Carrier furnished a printed receipt card to be given to subscriber. | (4) Same. |
| (5) Carrier paid flat rate of $3 for operation expenses of his transportation. | (5) Carrier not paid a flat rate but transportation expenses taken care of in reduced cost for papers charged by the News Company. |
| (6) Given list of subscribers to which new names listed or old stricken off from time to time. | (6) Carriers in some instances received list from district managers and in others from previous carriers, but were given new subscribers from time to time by company. |
| (7) Company received complaints and passed them on to carrier. | (7) Company received and solicited complaints but acted on them by delivering papers and then fining carriers. |
| (8) Had representative who checked up on carriers to see if everything was all right, furnished them with receipt cards, etc. | (8) Same. |
| (9) Gave no instructions as to routes to be followed or means to be used in distributing papers. | (9) Same, except Horne testified he from time to time instructed carrier about where to place papers when delivered, went out on route with carrier, checked up on subscriptions and receipts. etc. |

(10) Required to secure paper on time and deliver promptly.

(10) Same.

(11) Company could fire carrier at any time but carrier could not quit without notice.

(11) Same.

(12) Agreement contemplated carrier would be discharged only if services were deemed unsatisfactory.

(12) Boy fired if did not perform job like company thought he ought to.

We do not understand the case to be that the California court has reversed the Globe Indemnity Co. case, as is contended by defendant. It is inferable from the evidence that if a subscriber paid for a subscription in advance there was a contract with the newspaper which it felt itself obligated to carry out, and that the newspaper could require the newsboy to deliver the paper if it was on his route. If this was true it is not consistent with the idea of the relation of independent contractor. We do not think that the testimony of Horne to the effect that "if the paper tried to make the boy sell to people who wouldn't pay, a lot of times he wouldn't do it," and that "in the final analysis, that boy had the right to determine whether or not he was going to give a man a paper or not" affects our conclusion. The testimony is susceptible to the construction that as the newsboy had to pay for papers whether the customers paid or not he did not have to give them away. It does not mean that the paper could not require the boy to take on his list just as many subscribers on his route as paid in advance for any period of time.

Attention has been called to numerous cases from various jurisdictions wherein it has been held that boys engaged by a newspaper publisher to sell and distribute its papers to subscribers are independent contractors, but these are either cases where there is a definite and distinct contract defining the rights and duties between the parties and creating the relationship between them whereby the newsboy is an independent contractor, or are cases of mere sale by the company of its papers to newsboys for street sales. These cases are clearly distinguishable from the case now before the court where it appears from the evidence that the newspapers were not sold to the newsboys for the purpose of resale on the streets to any person that might come along, but were "sold" to the newsboys for the purpose of delivery to specifically named subscribers of the newspaper on a particular route under no definite contract setting out

and defining the rights and duties between the newsboys and the newspaper company.

The evidence was sufficient to authorize a finding that the newsboy was not an independent contractor, but was the servant of the newspaper company. The evidence did not demand a finding that the newsboy was an independent contractor, and the court erred in directing a verdict for the defendant.

*Judgment reversed. Stephens, P. J., and Felton, J., concur.*

SUTTON, J., dissenting. I dissent from the judgment of reversal, and, for reasons hereinafter shown, am of the opinion that the evidence demanded a finding that the newsboy in the present case was an independent cotractor and that the trial judge properly directed a verdict for the defendant.

No case involving the question here raised of the status of a newsboy in delivering papers for a publisher, under the circumstances shown, appears to have been before the appellate courts of this State. However, the rule to be applied in determining when one is an independent contractor has been stated many times. "Under the Georgia statute and decisions, the test to be applied in determining whether the relationship of the parties under a contract for the performance of labor is that of employer and servant, or that of employer and independent contractor, lies in whether the contract gives, or the employer assumes, the right to control the time, manner, and method of executing the work, as distinguished from the right merely to require certain definite results in conformity to the contract." *Yearwood* v. *Peabody,* 45 *Ga. App.* 451 (2) (164 S. E. 901). See also *Cooper* v. *Dixie Construction Co.,* 45 *Ga. App.* 420, 425 (165 S. E. 152); *Bentley* v. *Jones,* 48 *Ga. App.* 587, 590 (173 S. E. 737); *Swift & Co.* v. *Alston,* 48 *Ga. App.* 649, 650 (173 S. E. 741). No written contract having been entered into, from which an intention of the parties might be gathered, we must look to the evidence to determine whether or not the company reserved the *right* to control, not merely that it did control, the "time, manner, and method" of the work Elmore performed.

In a number of cases in other jurisdictions, some of which are referred to below, a newsboy or carrier of papers has been held to be an independent contractor, as distinguished from a servant of the newspaper publisher, under the particular facts shown. In Green-

164

ing *v.* Gazette, 108 Mont. 158 (88 Pac. 2d, 862), the carrier agreed to buy papers and deliver them within a certain time, to solicit subscriptions and report to the publisher, but was free to furnish his own method of delivery, and the contract provided that all money collected by the carrier from subscribers should be considered the property of the publisher until all papers furnished him had been paid for. In Creswell *v.* Charlotte News Pub. Co., 204 N. C. 380 (168 S. E. 408), the newsboy was furnished a certain number of papers to sell each day. The papers were delivered to him on credit and the boy settled for them at 3 cents each, retaining the selling price above this amount, and all unsold papers were returned to the publisher at the end of the day. Newsboys were assigned regular territory, and the publisher's supervisor checked up the boys in order to ascertain if they were on the job or needed additional papers. If a boy did not stay on his beat and was not active in selling efforts he lost his job. The boys were not on the publisher's pay-roll and conducted the selling according to their own methods. In Bernat *v.* Star-Chronicle Pub. Co., (Mo. App.), 84 S. W. 2d, 429, the newsboy purchased the paper route without the knowledge of the publisher and was designated "news dealer and circulator" and "agent" in contracts with the publisher, which contracts did not attempt to control the disposal, or manner of disposal, of the papers, although providing for length of service, time of payment of bills, and that papers be delivered promptly upon receipt by the newsboy. In Birmingham Post Co. *v.* Sturgeon, 227 Ala. 162 (149 So. 74), the newsboy was required to call at a stated time for his papers, to be at his news stand to receive other editions, to sell in a defined area at prices fixed by the publisher, and to account daily at a specified rate for all papers not returned to the publisher. In Balinski *v.* Press Publishing Co., 118 Pa. Super. 89 (179 Atl. 897), the newsboy bought papers from the publisher's district manager and resold them at a profit. He was required to sell at designated street corners and at a price fixed by the publisher, and was subject to some other restrictions, and the district manager refused to sell the boys papers if they did not follow usual customs. In New York Indemnity Co. *v.* Industrial Accident Com., 213 Cal. 43 (1 Pac. 2d, 12), the newsboy purchased from the district manager a specified number of papers, payable in cash or at the close of each day's sale, and undertook the retail-

ing of such papers to the public at a specified place and price fixed by the publisher. The boy was required to be active and vigilant in making sales of a prescribed minimum number of papers at or near his designated place. Otherwise his allotted place would be given to another boy and the district manager would refuse him further papers. The district manager testified that one of his own duties was to maintain a status of peace and harmony among the boys, and to so far supervise their daily conduct in the territory under his control as to promote the sale of the greatest possible number of copies of the paper within his district. In Carter Publications *v.* Davis, (Tex. Civ. App.), 68 S. W. 2d, 640, 643, it was stated that "an employer has a right to exercise such control over an independent contractor as is necessary to secure performance of the contract according to its terms and to accomplish the results contemplated thereby without creating the relationship of master and servant, so long as the employer does not destroy the employee's power of initiation nor undertake to control the employee in the means and manner of the performance of the work;" citing 14 R. C. L. 68.

After a careful examination of all the evidence and on application of the law, I am of the opinion that the trial court properly found that Elmore, the newsboy here, was an independent contractor and that the direction of a verdict in favor of the defendant was not error. The evidence, properly construed in its entirety, shows that the defendant possessed no right of control over Elmore more than the right to have the desired result accomplished, that is, the circulation of its newspaper. Elmore clearly bought from the defendant at wholesale the papers he delivered on his route, and he collected for them at retail. He was at liberty to solicit any one in his territory, and to discontinue any subscription whether the company approved or not. To him only the company looked for payment. It received payment whether or not Elmore was paid by the subscriber. The distribution of the papers was by his own method. The route was not marked out by the company but by another carrier, Elmore's predecessor. The conveyance used was Elmore's. How he covered his route daily was a consideration in which the company did not concern itself. Whatever the company did or could require is shown to have been only *for the purpose of obtaining the result* contemplated by its engagement with Elmore.

The plaintiff in error refers especially to certain portions of the evidence which, it is contended, negative any theory that Elmore was an independent contractor. The defendant on several occasions rendered bills to the Georgia Industrial Home and payments for subscriptions were made direct to it. This practice was not general towards Elmore's customers, and, in the case of the Georgia Industrial Home, it appears to have been merely an act of assistance to him. It could not of itself change the status of Elmore, particularly as it is shown that the money was in every instance credited to him and he was charged weekly with the same amount charged him for papers delivered to any other subscriber. The transaction was thus treated as Elmore's business, even if technically the bill-head, as between the company and the subscriber, indicated that the company was the Georgia Industrial Home's creditor. It is argued that the fact that customers paid a price of 20 cents per week, fixed by the company, and that the paper was delivered to a "predetermined" person, overcomes any idea of a sale to Elmore. But the evidence fails to show that the company really ever concerned itself with what Elmore was collecting. It merely debited him with charges for the papers, and he paid his account weekly. The person "predetermined" was not one predetermined by the company, but by a carrier, and Elmore sold to whomsoever he pleased. He could, if he desired, because of *his* experience with the subscriber, delinquent in payment or otherwise, change the predetermination and end the relationship, free from any protest by the company. Furthermore, the set price of 20 cents would not of itself fix his status as a servant. It is common knowledge that many commodities are sold by independent merchants at prices fixed by the manufacturer.

Again, it is argued that there was no outright sale to Elmore, because the company interested itself in and invited complaints from the subscribers. This evinces, however, merely a solicitude as to the ultimate object of the relationship with Elmore, namely, the circulation of its newspaper and the maintenance of the good will of the subscribers. Delivery into the hands of the subscribers was what it wanted to see effected. How this was accomplished did not matter. Even in the case of a most obvious independent contractor, the one who engages him would naturally be interested in the accomplishment of his task. The company here had the

right to insist upon delivery of its papers. Complaints which the company invited subscribers to register with it illustrated whether or not delivery was being effected. It appears that in fact the usual practice, in the case of a complaint because of nondelivery, was that the company would endeavor to contact the carrier and have him make proper adjustment. Where he could not be contacted, a paper was sent and the carrier charged a dime. Thus was the company's good will maintained and the circulation upheld. The practice illustrates, not a right of control as to the "time, manner, and method" of the work of the carrier, but only the interest of the company in the requirement of a *result*. Nor does the fact that a collector for the Macon Telegraph, under the same management as the defendant publisher, accepted a subscription to the Macon News and gave a receipt in its name, receiving no commission for the service, operate as an isolated instance to change the status of Elmore. He was given credit at the usual *weekly* rate and was charged just as in the case of any other subscriber. Thus the subscription was treated as if produced by him or his agent and as his business. He never requested such assistance, although inferentially he welcomed it, but he did not direct that the receipt be issued in the name of the newspaper.

It is further contended by the plaintiff in error that inasmuch as the Macon News was advertising its product in its own name, without advising the public that subscriptions were matters of control between the public and the carrier, it is thus shown that the company was exercising a right of control inconsistent with independence on the part of the carrier. The answer is that an independent merchant is none the less such by reason of collateral advertising of a product by the one who creates it. Much merchandise, for example, is advertised by both the ultimate seller and the manufacturer. The automobile that is sold by John Jones & Company in any Georgia town is nationally advertised by the manufacturer; and shall it be said that if, in demonstrating it, a third party is injured, the fact of manufacture advertising makes John Jones & Company an agent or servant and subjects the manufacturer to liability to the person injured? To state the question is to answer it in the negative. The particular advertisement relied upon by the plaintiff in error, and mentioned in the forego-

ing statement of facts, while carrying the name of the Macon Evening News is in its essence a joint appeal of carrier and newspaper. It advises the public of a contest between carriers for subscriptions, and a Bantam roadster is to be awarded the winner. It is only an instance of circulation promotion work, and not evidential of any reservation of right to control the time, manner, and method of his work if the appeal of the carrier is answered by a reader of the advertisement. Other facts relied on and argued by the plaintiff in error as establishing the carrier as a servant might also be discussed, but I think it sufficient to say, to avoid undue prolongation of this dissent, that they do not overcome the general design and nature of the carrier's employment as an independent contractor.

In the majority opinion the testimony of a former district manager or supervisor of the publisher, Robert Horne, was largely relied on to establish the newsboy here as a servant of the publisher. This witness, however, had been in charge of a district which was far removed from the territory covered by Elmore, and he did not purport to express any knowledge of the relationship between the Macon News and Elmore, although he testified generally as to the alleged control by the paper of its newsboys. Elmore was not, as was usually the case, given a list of subscribers on his route. The paper had no list of his customers. He obtained a route which had been developed by a former carrier, and not by the newspaper. The papers which were delivered to him had no names upon them. It is not disclosed that Horne ever went on Elmore's route, that he ever reprimanded him for putting a paper in a post-office box along the roadside, or at any time gave him any instructions as to what to do or not do. The bills made out by the Macon News were, in the case of Elmore, prepared at his request and for his benefit. Whatever might have been Horne's right as to "firing" other boys, he did not claim any such right as to Elmore. Indeed, with respect to the independence generally of the carriers, he testified: "If the paper tried to make the boy sell to people who wouldn't pay, a lot of times he wouldn't do it. *In the final analysis, that boy had the right to determine whether or not he was going to give a man a paper or not."* (Italics mine.) Refusing to deliver a paper to an existing subscriber certainly does not suggest any function comporting with the duty of a *servant,* and the

failure of the newspaper to voice its protest on such an occasion augments the reasons hereinbefore stated that the evidence really shows that what the company was interested in was results, and not the time, manner, or method employed by the carrier in accomplishing the object of desired circulation.

In Globe Indemnity Co. *v.* Industrial Acc. Com., supra, cited and relied on by my brethren, the facts were somewhat similar to those in the present case but there were differences. The newsboy was paid some *salary,* however small, and the court considered that the facts showed that "if given any instructions, they would have to be followed by the carrier, at the risk of being discharged if the carrier failed or refused to comply with them," and that "therefore, the right of control existed within the meaning of the tests stated by the authorities cited." No such reservation of right of control is shown in the present case. Neither was Elmore paid any salary. In New York Indemnity Co. *v.* Industrial Accident Com., supra, in which under the facts shown the newsboy was held to be an independent contractor, the Globe Indemnity Co. case, supra, was distinguished, the California court saying that the evidence there showed, not only that an "express relation of agency" existed, but that the newsboy, in addition to receiving a percentage of the monthly price which the subscribers paid, was also *paid a regular sum* to cover the cost of distribution in outlying territory. In State Compensation Insurance Fund *v.* Industrial Acc. Com., 216 Cal. 351 (14 Pac. 2d, 306), the Globe Indemnity Co. case was also referred to and the distinction made as in the New York Indemnity Co. case just above mentioned. While the distinction between being paid *as salary* a small sum in addition to the profits made by the newsboy on the sale of his papers and the reduced charge against a newsboy, as in the present case, for papers, because of the fact that his territory was in a rural district and his customers more scattered than in the case of a city route, may seem of no consequence, the fact of *salary,* however small, evidently constituted in the mind of the California court an important factor in the determination of the status of the carrier in the Globe Indemnity Co. case, supra. Without this factor it is doubtful if, under the facts otherwise shown, the California court would have ruled as it did in that case, if I correctly interpret the reasoning of the same court in the two later cases decided by it and referred to above,

and in which the newsboy was held to be an independent contractor. While, as contended, in effect, by counsel for the plaintiff in error the same motive prompts the payment of an additional sum as salary as in making a reduced charge to a newsboy who is engaged on a rural route, the fact remains that the matter of such reduced *charge* is entirely consonant with a relationship of independent contractor, while *salary* is not so identified but rather points out the status of a servant. The Globe Indemnity Co. case, relied on in the majority opinion, must be appraised in the light of the facts there shown and the reasoning of the California court thereupon, and the element of salary being lacking in the present case, in addition to the further fact that "In the final analysis the boy had the right to determine whether or not he was going to give a man a paper or not," whereas in the Globe Indemnity Co. case the court thought the carrier "was obliged to follow instructions," the case relied on in the majority opinion is not, in my opinion, of such persuasion and authority, when applied to the facts of the present case, as to authorize a ruling here that the newsboy Elmore was a servant and not an independent contractor.

In Wilson *v.* Times Printing Co., 158 Wash. 95 (290 Pac. 691), cited by the plaintiff, there was a written contract and, as stated in Greening *v.* Gazette Printing Co., supra, distinguishing it, the paper retained a high degree of control over the carrier and gave him detailed instructions frequently as to where he was to go and what he was to do. The company furnished him with receipt blanks to be delivered to subscribers, and concluding with the words "Received payment for the company," followed by a blank line for the carrier's signature. In addition to the profits which the carrier received on the sale of the papers, he was paid $98 per month, a part of which was to compensate him for using his own car in his work and a part as salary. Obviously the facts in that case are distinguishable from those here under consideration.

A leading case in this State on the question of an independent contractor is *L. & N. Railroad Co.* v. *Hughes,* 134 Ga. 75 (67 S. E. 542), where certain rights of supervision and control were retained by the employer, and still it was held that the relationship of independent contractor existed. See also *Lee* v. *A., B. & A. R. Co.,* 9 Ga. App. 752, 754 (72 S. E. 165); *Quinan* v. *Standard Fuel Supply Co.,* 25 Ga. App. 47 (102 S. E. 543); *Malin* v.

*Augusta,* 29 *Ga. App.* 393 (115 S. E. 504); *Poss Lumber Co.* v. *Haynie,* 37 *Ga. App.* 60 (139 S. E. 127); *Cooper* v. *Dixie Construction Co.,* 45 *Ga. App.* 420 (165 S. E. 152). Some supervision and control over the manner of doing the work, where done for the purpose of accomplishing the result intended, is not inconsistent with the relationship of employer and independent contractor. Under the evidence in the present case I am of the opinion that the carrier was an independent contractor, and not a servant of the newspaper, and that the trial court properly directed the verdict in favor of the defendant.