33570.   MORRIS *v.* CONSTITUTION PUBLISHING CO.

Decided October 4, 1951.   Rehearing denied November 9, 1951.

Worrill, J.   Mrs. Morris sued the Constitution Publishing Company for damages allegedly sustained when she tripped and fell over a bundle or roll of newspapers allegedly left by the defendant's agent and servant in the doorway or on the stairs

forming a part of the entryway where the plaintiff lived. The defendant answered generally denying the allegations of the plaintiff's petition, and subsequently amended its answer by alleging that the acts complained of in the plaintiff's petition were not committed by the defendant or its agent but by an independent contractor. Upon the trial of the case the trial court directed a verdict for the defendant and judgment was entered on that verdict. The exception here is to that order and judgment.

On the trial of the case the plaintiff introduced evidence by the news carrier, who left the papers on the stairway where the plaintiff fell, as to the nature of his work, working arrangements with the defendant, etc., and evidence of the nature and extent of her injury, and the defendant introduced the written contract of employment entered into between the defendant company and the labor union of which the carrier was a member, and rested. The pertinent provisions of this contract are as follows: "Section Two. It is specifically agreed that all carriers under this contract are independent carriers. Section Three. The newspaper, when agreed to by the union, shall expect the following results of the carriers:—(a) The maintenance of circulation and draw of papers in accordance with any reasonable requirements which may be established by the newspaper; (b) The satisfaction of the subscribers as evidenced by reliable and prompt delivery of their newspapers; (c) Reasonable solicitation and cooperation in the efforts of the newspaper to maintain and increase its circulation." Section Six of the contract provides that the purchase price of the newspaper to the carriers shall be so much per hundred depending upon the total circulation of the paper, providing generally that as the total circulation increases, the cost to the carriers shall decrease, and this paragraph further provided that, "If the newspaper should increase or decrease the price of the paper, to the public, it is agreed that the rate to the carriers will increase or decrease proportionately, and the newspaper may make the increase for daily or Sunday." Section Seven provides that the "Carriers will not be required to extend credit to anyone who, in their judgment, is not a good credit risk. Carriers shall notify the newspaper, within 24 hours after receiving a start [notice of a new subscriber], of their refusal to

deliver the paper on account of credit risk. The newspaper may then, if they desire, instruct the carrier to start a paper for a specified period to such a subscriber, and the carrier agrees to deliver the paper regularly and make conscientious efforts to collect for it. If collection cannot be made, carrier shall notify the newspaper and shall receive credit for such delivery." Section Nine provides that "All new carriers shall be competent, and the conditions and provisions of this contract shall govern their actions. They shall have such qualifications as the newspaper may, in good faith, require, and shall be of good character and of such financial responsibility as to carry out their obligations hereunder, and must have such educational qualifications (or their equivalent) as the newspaper may require, and shall have good health. In the event a carrier cannot make deliveries for a short period of time, it is his obligation to see to it that the papers are delivered through some substitute of his own choosing, the compensation of the substitute to be paid by the carrier." Section twelve provides that each carrier shall put up a cash bond of $25 for each hundred copies of the paper or a fraction thereof. Section Seventeen of the contracts provides that "All carriers shall pay their bills for the preceding week in cash on the following Monday or Tuesday, and in no case later than 12 noon on Tuesday, except that, in case of a holiday, the newspaper may extend the time twenty four (24) hours. In cases of emergencies individual carriers may be given an extension of time by the newspaper, not to exceed one week, to pay their bills. District supervisors and other employees of the newspaper shall have the power only to make suggestions to the carriers. The newspaper may make suggestions and give the carriers the benefit of its knowledge and cooperation in service matters. For the convenience of the carrier and subscribers the newspaper may receive any money intended for the payment by patrons for the paper and shall account for such sums to the carrier, the newspaper acting as agent for the carrier and accepting such money for transfer. The newspaper, if it sees fit, may offer prizes to carriers."

Further pertinent provisions of the contract are: "Section Eighteen. Except where inconsistent with other provisions of this contract, it is agreed that when a carrier is charged with

the violation of this contract, or inability to obtain results in conformity with the contract, or with any improper conduct, he shall not be suspended until the Joint Standing Committee shall pass on the case. In case of misconduct the Joint Standing Committee shall pass on the case within three (3) days after it is reported to them. Neither the Joint Standing Committee nor the Board of Arbitration provided herein shall have the power to order back compensation or pay for any suspended or dismissed carrier. While a carrier is suspended or dismissed his substitute shall retain the profits of the route during the suspension. Section Nineteen. The newspaper shall give two weeks notice of intention to release or lay off a carrier. A carrier who severs his relationship with the newspaper shall give two weeks written notice to the newspaper unless the newspaper agrees to an earlier date. . . Section Twenty-three. The newspaper shall have the right to establish office rules of general application in conformity with this contract and to publish them and such rules, when not inconsistent with the terms of this agreement, shall be binding. However, the newspaper shall not have the right to establish any rules which will have the effect of making the carrier the servant or employee of the newspaper."

"Under the Georgia statute and decisions, the test to be applied in determining whether the relationship of the parties under a contract for the performance of labor is that of employer and servant, or that of employer and independent contractor, lies in whether the contract gives, or the employer assumes, the right to control the time, manner and method of executing the work, as distinguished from the right merely to require certain definite results in conformity to the contract." *Yearwood* v. *Peabody*, 45 *Ga. App.* 451 (2) (164 S. E. 901). "The question whether the newsboy was a servant of the defendant or an independent contractor must be determined by the terms of the contract between the parties. If the terms of the contract do not appear, then they may be inferable by the conduct of the parties in the performance of the contract." *Hampton* v. *Macon News Printing Co.*, 64 *Ga. App.* 150, 155 (12 S. E. 2d, 425).

The portions of the contract of employment set out above, which the evidence shows the carrier in question to have been

under, clearly denominate the carrier as an independent contractor. Under such circumstances and under the test set out in the *Yearwood* case, quoted above, that relation is presumed to be the true one unless the evidence shows that the employer assumed some control over the time, manner or method of doing the work despite the provisions of the contract to the contrary. The only evidence as to this relationship and the manner in which the parties to the contract of employment actually performed the contract is shown in this case by the testimony of the carrier himself as elicited from him on direct and cross examination when he was placed on the witness stand as a witness for the plaintiff. This witness, Ralph R. Gentry, testified that "I reckon I am employed by the Constitution, or myself, one, I don't know which. I went with them July 16, 1945. I reckon I am employed by the Constitution Publishing Company. I do not get a pay check from them. The people on my route pay me . . . I buy papers from them and resell them. As to whether I don't get any kind of check from them: I just pay my bill every week. I collect my money from the public, the people, the subscribers that take the paper. I furnish myself a truck; I don't use one of the Constitution trucks. This helper that I mentioned a while ago is employed by me, I pay his salary. . . As to whether I decide where I am going to deliver the papers or does a representative of the Constitution tell me where I will go: They tell me my boundary lines, where I should deliver them; it is up to me to get out there and get the subscribers; they tell me where my boundary line is at. They specify the streets that I can handle."

With reference to the time when Mrs. Morris tripped or fell over the bundle of newspapers left by the witness in the entrance stairway where she lived, he testified that someone called the Constitution supervisor, Mr. Myrick, and he told the caller that "I was an independent dealer out there and I handled that and that he would get in touch with me and have me call him." Testifying further in reference to that incident, he said "so he got in touch with me . . and when I called . . I told her . . . that I heard somebody had stumbled over a bundle of papers and hurt themselves and she . . told me all about it. As to what, if anything, did Mr. Myrick tell me about putting

the papers over there: In fact, Mr. Myrick didn't know anything about it; he didn't know I put the papers there. After the injury he did not tell me to stop putting them there; nobody told me not to put them there, that I remember. As to what was it Mr. Myrick told me about the papers and the steps and all: I don't reckon he told me anything about it. Mr. Myrick told me somebody had been hurt out there on the papers but he didn't tell me to stop putting them in the stairway; he told me somebody had got hurt and for me to call and check on it and said that he had told them that he would come out and see them."

The witness further testified that "Without some good reason, they could not fire me without giving me two weeks notice. They did have the right to take away that route, if they had a reason, that I wasn't handling it right, but if they did that, they had to place charges against me; you see, we are organized and it had to be brought before the committee; in other words, if it was a just cause, they could discharge me. . . As to whether I mix this money I collect from my customers with my own money and just pay my bill every Tuesday, or as to whether I take the money up and deposit it in the bank, or what: I probably mix it up. . . I go up on Tuesday . . and I pay them . . regardless of whether I ever collect from all my customers at all." Gentry's testimony with reference to customers whose credit he considered bad was to the effect that he could inform the newspaper of his views on the customer and if the customer thereafter turned out to be a bad risk and he lost money on that customer after delivering papers on the newspaper's instructions, they would indemnify him against any loss thus occasioned.

All of this testimony in no way indicates that the relation between the defendant and Gentry was other than as specified in the written contract introduced in evidence and would not authorize a finding that the relation of master and servant existed. This view is not altered by the fact that Gentry, as a part of his duties, collected insurance premiums and magazine subscription payments from some of his newspaper customers and remitted the funds thus collected to the newspaper in full, later receiving a credit in the nature of a commission thereon for that service. Neither is this view of the case altered by the fact

822

that Gentry was expected to complete delivery of all his papers by six each morning. This was merely a certain definite result expected under the contract and was not an attempt by the defendant to regulate the time or manner of doing the work.

Under the evidence a finding that the carrier Gentry was an independent contractor operating his own business and required merely to accomplish a certain definite result, that is, delivery of a certain number of newspapers to designated customers each morning, before six o'clock, was demanded, and the trial judge did not err in directing a verdict for the defendant on the ground that the carrier, whose acts were alleged to be the cause of the plaintiff's injuries was not a servant, employee or agent of the defendant newspaper, and that the latter, therefore was not liable to the plaintiff under the doctrine of respondeat superior.

*Judgment affirmed. Sutton, C. J., and Felton, J., concur.*

*T. J. Lewis, Ralph R. Quillian, T. J. Lewis Jr.,* for plaintiff
*T. J. Long,* for defendant.