## JAX BEER CO. v. REDFERN.

### No. 9877.

Circuit Court of Appeals, Fifth Circuit.

Dec. 10, 1941.

Emil Corenbleth, of Dallas, Tex., and F. F. Beadle, of Houston, Tex., for appellant.

Bruce L. Graham, of Dallas, Tex., for appellee.

Irving J. Levy, Asst. Sol., U. S. Dept. of Labor, of Washington, D. C., for amicus curiae.

Before FOSTER and McCORD, Circuit Judges, and DAWKINS, District Judge.

McCORD, Circuit Judge.

R. J. Redfern, individually and for the use and benefit of his co-employee, W. E. Wadsworth, brought suit against Jax Beer Company to recover overtime compensation, liquidated damages, and attorney's fees under the provisions of Section 16(b) of the Fair Labor Standards Act of 1938, 29 U.S.C.A. §§ 201–219. The case was tried before the court without a jury, and judgment was rendered for the employees. Jax Beer Company has appealed.

The employment of Redfern and Wadsworth was in existence before the advent of the Fair Labor Standards Act, and continued after the act went into effect. This suit was brought almost two years after the alleged overtime work had been performed.

The record shows that Redfern and Wadsworth were employed by Jax Beer Company, a Texas corporation, to make deliveries of beer by truck to its Dallas customers, and that they were required to work on local delivery routes and were not permitted to sell or deliver beer except in the limited territory assigned to them. In their original petition plaintiffs sought recovery of overtime based upon an alleged salary of $14.70 per week, but this petition was amended at the suggestion of the court after evidence had been introduced showing that they received $14.70 per week and three cents per case commission on all beer delivered by them.

The nature of Jax Beer Company's business, and the relationship and duties of Redfern and Wadsworth is found in the record in "Plaintiff's Exhibit 1", which is an agreed statement of facts and reads as follows:

"The beer handled by plaintiffs is brewed in New Orleans, Louisiana by Jackson Brewing Company, a corporation. Since June 29, 1939 the beer has been shipped by Jackson Brewing Company in New Orleans to Jax Beer Company at Dallas by direct rail shipments. The cars upon arrival are unloaded and the beer placed in defendant's warehouse in Dallas, from which warehouse the trucks driven by plaintiffs are loaded and plaintiffs distribute such beer by such trucks to retail customers of Jax Beer Company in or near the City of Dallas, Texas.

"Jax Beer Company is a wholesale distributor of beer and holds a general distributor's license under the laws of the State of Texas. Jax Beer Company does not sell to the ultimate consumer.

"Prior to June 29, 1939 the beer handled by Jax Beer Company at its Dallas branch, including the beer handled by plaintiffs prior to that date, was received by it at Houston, Texas, being shipped to Houston, Texas, partly by direct rail shipments from Jackson Brewing Company, and was transported by it from Houston to Dallas by its own owned or leased trucks, from which trucks the beer, upon arrival in Dallas, was unloaded into its Dallas warehouse and from there, in turn, loaded out onto the trucks driven by plaintiffs, the same as the beer received direct from New Orleans has been handled since June 29, 1939."

After careful reading of the findings of the trial court, we are of opinion that he misinterpreted the agreed statement of facts. The trial court stated in his findings: "It is not a case where goods were purchased from outside of the State and then came to rest for sale to some parties who would come in and inspect and look at it and buy it. Here is the agent of the manufacturer in Louisiana, has a depot here for distribution. I think it is a very clear case of interstate commerce." In this there was error. There is no evidence in the record showing that Jax Beer Company was the agent of Jackson Brewing Company of Louisiana, and the agreed statement of facts and the undisputed evidence clearly shows that it was not. It is also clear from the agreed statement, and other evidence in the case, that Jax Beer Company, and not Jackson Brewing Company, owned the Dallas warehouse; that the warehouse was not the depot for Jackson Brewing Company; that when the beer shipped from Louisiana by the Jackson Brewing Company was received in Dallas by the appellant, it was unloaded and stored in the warehouse belonging to Jax Beer Company; and that the trucks which delivered the beer belonged to Jax Beer Company.

■ We turn to the question of whether Redfern and Wadsworth were, under the agreed and undisputed facts, entitled to the benefits of the minimum wage and overtime provisions of Sections 6(a) and 7(a) of the Fair Labor Standards Act. In support of the findings and judgment of the lower court the appellees contend that Jax Beer Company was engaged in interstate commerce; that its warehouse was but a temporary place of storage for the beer received from out the State; and that the flow of commerce did not end until the beer reached the ultimate consumer. We

think it clear that the local selling and distribution of beer by the appellant is intrastate—not interstate—in character. The mere fact that Jax Beer Company engaged in interstate commerce by purchasing its beer from a Louisiana corporation and having it shipped to Texas does not compel a finding that all of its employees were engaged in commerce within the meaning of the act.

■ As to what is and what is not interstate commerce the appellees and the Administrator of the Wage and Hour Division, in his brief as amicus curiae, lay stress upon the language contained in many decisions under the National Labor Relations Act, 29 U.S.C.A. § 151 et seq. These cases are not altogether applicable for, as pointed out by the Supreme Court, the "critical words" of the National Labor Relations Act are "affecting commerce". Santa Cruz Fruit Packing Co. v. National Labor Relations Board, 303 U.S. 453, 467, 58 S.Ct. 656, 82 L.Ed. 954. Sections 6(a) and 7(a) of the Fair Labor Standards Act do not employ these "critical words", but instead provide that employers shall pay specified minimum wages and overtime to each of their employees "who is engaged in commerce or in the production of goods for commerce". These words make application of the minimum wage and maximum hour provisions of the act dependent upon the nature of the work performed by the particular employee, and not upon the fact that the business of the employer may in some manner "affect commerce". This interpretation would appear to be the one intended by Congress when it enacted the law. In the case of Jewell Tea Company v. Williams, 118 F.2d 202, 206, the Tenth Circuit Court of Appeals, in interpreting the act, alluded to the legislative history of the statute, and pointed out that as originally passed by the Senate it was limited to employees engaged in or producing goods for interstate commerce; that the House, by amendment, broadened the coverage by requiring time and a half for all employees of an employer "engaged in commerce in an industry affecting commerce"; that in the conference draft of the bill the Senate refused to accede to the House amendment, and the test of coverage contained in the original Senate bill was restored by applying the act to employees "engaged in commerce or in the production of goods for commerce"; and that Senator Pepper, a member of the conference committee, in discussing the terms of the act before the Senate said, "I want it distinctly stated that this proposed law is not applicable to all employees of an industry which itself is engaged in interstate commerce. It is applicable only to those employees who themselves are engaged either in interstate commerce, or in the production of goods for interstate commerce, and the contrary theory was definitely rejected by the Committee."—83 C. R. 9168 (Senate—75th Cong., 3rd Sess., June 14, 1938).

■ Certain it is that these employees were not producing goods for interstate commerce, and decision must turn upon whether or not they were engaged in interstate commerce within the meaning of the act. We are of opinion that the work of Redfern and Wadsworth in delivering beer for the Jax Beer Company in pursuance of its local beer distributing business was intrastate in character and that they were not "engaged in commerce" within the meaning of the Fair Labor Standards Act. Jewell Tea Co. v. Williams, 10 Cir., 118 F.2d 202; Klotz v. Ippolito, D.C., 40 F.Supp. 422; Foster v. National Biscuit Co., D.C., 31 F.Supp. 552; Fleming v. Arsenal Bldg. Co., D.C., 38 F.Supp. 207.

■ Although the agreed statement of facts shows that beer was unloaded from the box cars into Jax Beer Company's warehouse and thereafter from day to day placed in trucks for delivery and sale to local customers, the plaintiffs testified that at times they would secure a reload of beer direct from the cars onto the trucks. The evidence was clear that the trucks were loaded from the warehouse at night by the warehouse crew, and plaintiffs themselves testified that they came by the warehouse for the trucks at seven o'clock each morning, and that when they arrived the trucks were loaded and ready to go. Unloading of freight cars may constitute employment in interstate commerce, Super-Cold Southwest Company v. J. L. McBride, 5 Cir. decided Dec. 1, 1941, 124 F.2d 90; Klotz v. Ippolito, D.C., 40 F.Supp. 422; but such unloading was not shown with definiteness in this case. The agreed statement negatives such contention, and the trial court found that only "Sometimes, but not so stipulated by the parties in this case, they unloaded it from the car and placed it in the wagons for distribution". Such indefinite evidence should not be made the basis of a judgment for overtime work alleged to have been performed in interstate com-

merce. Cf. Super-Cold Southwest Company v. McBride, supra.

Aside, however, from the nature of the work performed by Redfern and Wadsworth, the evidence is not sufficient to support the verdict and judgment. Neither plaintiff was able to testify as to the number of hours worked each day, but each testified that "on an average" they worked from seven o'clock in the morning until nine o'clock at night. Redfern was unable to testify as to the number of days he was off from work, and could give no accurate information as to the amount of salary, including commissions, that he received during the disputed period. Wadsworth testified that, with few exceptions, he worked on his truck from seven in the morning until nine at night, and that many times he worked as late as ten, eleven, or twelve o'clock.

"Q. Now, it is your testimony that during all of this period of time, since October, 1938, your route required you to stay out, with the few exceptions you have mentioned, until 9:00 o'clock or later every night? A. I base that on the average. * * *

"Q. You originally received $15.00 per week salary, didn't you? A. Well, I might have, I don't recall it.

"Q. Do you remember when that was changed to $20.00? A. I remember that it was changed for maybe three weeks.

"Q. Do you remember when it was that changed again to $14.00 a week? A. About three weeks after it was changed to $20.00.

"Q. But your commission was never changed, it was always three cents? A. I don't recall."

Henderson, a witness for the plaintiffs, testified that he worked as night checker for Jax Beer Company; that he always checked the plaintiffs in at night; that they always worked until after nine o'clock, six days per week, and many times as late as ten, eleven, or twelve o'clock; that he never had a vacation; that he never missed a night from his work; that he never checked either of the plaintiffs in until after nine o'clock at night or later; that no one went off duty when he went on at four-thirty in the afternoon; and that no one was there until he went to work. The record, however, shows that Henderson was absent as checker for fifteen days during the time in question, and it was without dispute, save and except the testimony of Henderson,

that Duke and others always worked at the warehouse until three-thirty or four o'clock in the afternoon.

The evidence makes up a mass of contradictions and is so lacking in credence that the trial judge in summing up the case said: "As I have said before, there are no records. The matter has been very poorly presented. The burden is on the plaintiffs to make out their case by a preponderance of the testimony; if they have not done so, then they should not receive a verdict. That is the law. That is what I would charge the jury if it were a jury trial, and if the jury went out into the room to figure, I don't know how they would figure. They have been given nothing to figure on, other than what I have already indicated. * * * I wish to say, if I were forced to defend my verdict by the ability to place my fingers on the figures, I would have some difficulty in doing that, but using the best lights I have here and the best figures I have, and giving each party that to which he is entitled, as I view it, that comes as near getting the right of it as I can." He thereupon entered judgment for $722 and $680 for Redfern and Wadsworth respectively, and awarded an attorney's fee of $150. The figures upon which the awards were made are not shown, nor is it shown whether the commissions received by the employees were included as a part of their salary, and we are of opinion that they were not included.

The evidence as to the material facts in the case is so uncertain and conjectural that we find nothing substantial upon which to predicate a verdict. To uphold the findings and judgment of the lower court we must base decision upon the guess, speculation, and averages made up from the uncertain recollections of these appellees. This we refuse to do.

The agreed statement of facts and the evidence bearing upon the business of the appellant and the work performed by the appellees leads to the conclusion that Redfern and Wadsworth were not working in interstate commerce. However this may be, the record evidence is insufficient to support a verdict, and they may not recover.

The judgment is reversed.

FOSTER, Circuit Judge, concurs in the result.