**SCHROEPFER et al. v. A. S. ABELL CO., Inc.**

**No. 1609.**

District Court, D. Maryland.

I. Duke Avnet, of Baltimore, Md., for plaintiffs.

William D. Macmillan and Semmes, Bowen & Semmes, all of Baltimore, Md., for defendant.

CHESNUT, District Judge.

This case is a civil suit under the Fair Labor Standards Act, 29 U.S.C.A. §§ 201-219, by alleged employes of the defendant to recover deficiency in minimum wages together with liquidated damages and counsel fee, in accordance with the liability therefor imposed by section 216(b). The defenses are: (1) that the plaintiffs were not employes of the defendant at all within the meaning of the Act; and (2) that the plaintiffs, if employes, were not engaged "in commerce or in the production of goods for commerce". §§ 206, 207. The defendant is a Maryland corporation which publishes and sells the well-known Morning and Evening Sun and Sunday Sun newspapers. The defendant does not dispute in this case that it is engaged in interstate commerce within the meaning of the Act, although of its large paid-for circulation only a small percentage of its newspapers are shipped to destinations outside the State of Maryland. See National Labor Relations Board v. A. S. Abell Co., 4 Cir., 97 F.2d 951, 953.

A jury trial was waived and the case has been submitted, after argument by counsel, upon testimony of witnesses in open court. From the evidence I make the following *finding of* relevant *facts*.

1. The paid-for circulation of the defendant's daily papers, morning and evening editions, was in 1937 about 150,000 copies, with a somewhat larger circulation for the Sunday Sun. About 7.5% of the daily morning and Sunday papers and about 2% of the evening papers are shipped to destinations outside the State. Its representatives gather much news matter outside the State and advertising is solicited outside the State. Raw materials used in the publication of the newspapers are derived principally from sources outside the State. In 1937 the defendant had a total employment roll of over 1100 persons with a payroll cost of nearly $200,000. Substantially the same conditions have since prevailed. The defendant is therefore engaged in interstate commerce.

2. Two of the plaintiffs, Fred and Charles R. Schroepfer, brothers but suing separately and individually for deficiency in compensation, were during the period involved in this suit, October 24, 1938 to January 19, 1942, occupied as distributors of the defendant's newspapers, to street corner vending machines and to stores wholly located in portions of Baltimore City or the immediately adjacent county. The third plaintiff, Abraham Berry, was principally employed as a helper by the Schroepfers, part of the time by one and at other times by the other, and was paid by them respectively. On Saturday nights Berry was also directly employed by the defendant for about eight hours and for that work was paid by the defendant.

3. The Schroepfers were known in the business as rack-men. Their relations with the defendant were not defined in writing and had existed for several years prior to October 24, 1938, when the Fair Labor Standards Act became effective. Each had a separate territory for the distribution and sale of newspapers. Their activities consisted in the delivery of the several successive editions of the daily newspapers to the street-corner vending machines, and of the Sunday papers to some stores in their respective territories. The vending machines were in the general form of metal racks placed on various street corners, holding a number of copies of papers, with a receptacle under lock and key for the deposit of coins to be made by the purchasers of the papers. The rack-men, of whom there were about fourteen for Baltimore City, collected the money daily from the vending machines. They were entitled to retain or be credited with the whole of the money so collected. Their accounting with the defendant was as follows. They were charged at wholesale rates, about 1¢ per paper less than the price paid by the purchaser, for the number of papers that they received from the plant of the defendant in Baltimore City, and also about $3.00 per week for so-called rack rental; and they were credited with the amount of currency collected from the vending machines and turned in to the defendant's office; and with the wholesale price of papers returned as not resold to the public; and were also credited with $25.00 per week for an allowance on account of the expenses of ownership and operation of their own automobiles used in distributing the papers, with a further allowance of $3.00 weekly for delivery of Sunday papers to various stores, since they received no personal profit from the sale of Sunday papers. If for any reason their own automobiles were out of service

on a particular day they were furnished with an automobile for the delivery of papers by the defendant and charged a certain sum therefor. Weekly settlements were made by the defendant with the rack-men on this accounting basis. The rack-men directly employed and paid such helper or helpers as they needed or required for their activities. They could take for resale more or less papers of each edition provided their territory was adequately served. The defendant did not interfere with or control in any way the activities of the Schroepfers in the distribution of papers to the vending machines, or the collection of cash therefrom, and there was no requirement that the cash must be delivered to the defendant, if the papers were otherwise paid for, although for convenience the rack-men did at once turn in the many small coins to be counted in a machine and credited to them. The arrangement of the rack-men with the defendant was terminable at will by either party, but in many years only three of fourteen rack-men had discontinued (for reasons not appearing in the evidence).

4. The Schroepfers contend that they were employes of the defendant, but the defendant contends that they were not its employes but independent purchasers and salesmen of papers, or in the legal sense, independent contractors. Much detailed evidence was submitted by the respective parties bearing on this particular issue. From the weight of the testimony I find as an ultimate fact (or conclusion of law as the case may be) that the legal relationship of the Schroepfers, and the defendant was that the former were not employes but independent operators during the period involved in this suit. Much of the testimony related to the particular item of the $25.00 weekly allowance above referred to. Plaintiffs insist that this was in the nature of a weekly salary while the defendant says that it was allowance for automobile expense. The particular designation of the item is in my view not controlling of the issue as to whether the plaintiffs were employes, but so far as it is material, I find from the weight of the evidence that the item was properly to be classed as car allowance rather than salary. It was only one of the items entering into the weekly settlement. It was not payable except to the extent of the balance, if any, due on the whole weekly accounting.

It is clear from the evidence that the defendant did not treat the Schroepfers as employes. The defendant carried group insurance for its employes but the Schroepfers were not included therein. They were not carried on any of the books or records of the defendant as employes, or credited thereon with any salary or wages. The defendant's employes were given annual vacations with pay but this did not include the rack-men. The defendant reported and paid no social security taxes for the rackmen.

5. The plaintiffs rely upon some indicia said to be consistent only with their being employes rather than independent operators. I find from the testimony that Charles Schroepfer first became a rackman for the Sun papers in 1929, and Fred Schroepfer in 1932. Fred Schroepfer's original arrangement with the defendant was that he received a salary of $18.00 a week, and a car allowance of $15.00, and was entitled to the profits made by him on the sales of papers from the racks. The arrangement with Charles Schroepfer in 1929 was about the same. In 1932 the racks then in use were found unsatisfactory in operation because from defective mechanism too many papers were lost or stolen therefrom. Some months later, after Fred Schroepfer first became a rack-man, the defendant substituted new and better vending machines and changed the cash credits to the rack-men by abolishing the item for salary and substituting therefor one weekly credit of $25.00 which was designated on the defendant's records as "auto allowance". (See Defendant's Exhibit No. 1). The plaintiffs said that they knew when the change was made but were not specifically advised that it abolished their salary item, and that they continued to sign a little white slip accompanying each weekly envelope with the cash due them, which read with date: "Received of the A. S. Abell Company salary in full for services rendered to date". Fred Schroepfer said that he supposed the reduction in his weekly credit from $33.00 a week to $25 meant that his salary was continued at $18.00 with reduction of car allowance to $7. I find from the evidence, however, that the continued use of the white slip to be signed by the rack-men weekly upon receipt of the balance due them in cash on the weekly accounting was merely an inadvertent clerical practice which was changed in May 1941, upon its discovery by the circulation manager; and there was then substituted for the white slip a blue slip reading: "Received of the A. S. Abell Company automobile allowance in full to date". The

exhibit just referred to shows that the amounts respectively due the rack-men as cash credits as approved by Mr. Kavanaugh, assistant business manager, were designated as "auto-allow". In a letter dated September 16, 1941, addressed to Mr. Kavanaugh, the rack-men in asking for some changes in accounting requested "a $15.00 weekly increase in car allowance". This was after the blue slip had been substituted for the white. I do not find from the evidence that the plaintiffs were misled to their prejudice in any way by the inadvertent continued use of the white slip. The rack-men also were advised or required by the defendant to carry automobile liability insurance policies in their names; and for some time the policy also included the name of the A. S. Abell Company as one of the insured, but later (it does not appear just when) the name of the Abell Company was eliminated from the policies. Neither the policies themselves nor the policy forms thereon were introduced into evidence. The rack-men paid $1.50 per week for the premium on their liability policies. These payments were for convenience made by the rack-men to one of the minor officials of the defendant and by him turned over immediately to the agent of the insurer. The weekly amounts so paid were not funds of the defendant and were not in any way carried on its books. The employe of the defendant in this connection merely acted for the rack-men. The defendant frequently gave the rack-men posters of advertising matter to put in the racks to encourage sale of papers, calling attention to news items or special features. One such poster called attention to the rates for weekly deliveries of Sun papers to homes, at less cost than retail purchase from the racks.

6. The plaintiffs testified as to the amount of their net profits from their activities in the distribution and sale of defendant's papers. Fred Schroepfer testified that his net compensation was at the rate of 43.1¢ per hour for the year 1939; 40.5¢ per hour for 1940, and 36.9¢ per hour for 1941. Charles Schroepfer testified that his hourly rate of compensation was 38.1¢ for 1939; 31.8¢ for 1940, and 39.5¢ for 1941. This computation was made on the basis of their further testimony that their activities occupied their time for not less than 72 hours per week. They produced copies of their income tax returns for these years, or some of them, which showed figures substantially in accordance with their computation of their hourly rate of compensation if based on a work week of 72 hours. In some of these income tax returns, federal and state, they said that their occupation was "newspaper salesman". In the federal returns their gross income from their newspaper work was included under the line in the tax blank reading: "Salary and other compensation for personal services". In some of the Maryland state income tax returns the plaintiffs distinguished between salary from the A. S. Abell Company as employer and income from papers, less loss, etc. The amount stated for salary when separately given was $1456 which was at the rate of $28.00 per week for 52 weeks, representing in the items of accounting above mentioned, $25.00 a week for salary or car allowance and $3.00 a week allowed for delivery of the Sunday Sun to stores. The gross receipts of each plaintiff from the business varied a few hundred dollars from year to year but approximated $4,000. Their annual expenses also varied a few hundred dollars per year but approximated $2500 as an average. The weekly gross receipts varied from week to week and more particularly from season to season dependent upon the amount of newspapers sold through the vending machines.

7. With respect to the number of hours of work each week there was no written evidence in corroboration of the plaintiffs' own verbal testimony or any contradiction thereof. They kept no record of their hours of work. The defendant made no requirement as to hours of work by the plaintiffs who were at liberty to and did from time to time furnish a substitute or helper when they respectively preferred to do so. Generally, however, the proper attention to the distribution of the papers required the plaintiffs or some one for them to report with their automobile at the Sun office about 4 A.M. for the first edition of the morning paper and to thereafter distribute the number of copies to the vending machines. It was also necessary for them or their helpers or substitutes to thereafter during the day distribute other editions of the morning and evening papers to the street racks. With the exception of time off for meals the plaintiffs estimated that they were continuously occupied from about 4 A.M. to 7 P.M. On each trip they generally used a so-called helper or jumper boy. Their principal expenses were for the maintenance and upkeep of the delivery automobile and for the wages paid to their

helper who in the case of the Schroepfers was usually the third plaintiff, Abraham Berry. The defendant made no requirement of the Schroepfers as to whom they should employ as helper or how many helpers or as to the wages paid the helpers. And this was true with regard to the rackmen generally. Fred Schroepfer claims $896.09, and Charles Schroepfer also the same amount to the cent as deficiency wages. As to the sufficiency of such estimates of hours of work to base a verdict thereon under the Act, see Jax Beer Co. v. Redfern, 5 Cir., 124 F.2d 172, 175. Compare Johnson v. Dierks Co., 8 Cir., 130 F.2d 115.

8. The plaintiff, Abraham Berry, was employed by the Schroepfers and paid $15.00 a week. Generally he worked in the morning for Fred Schroepfer and in the afternoon and evening for Charles Schroepfer. In this capacity the defendant had no relations of any kind with Abraham Berry. Berry also worked on Saturday nights only at the office of the defendant for about 8 hours, and was paid at the rate of 50¢ per hour, which was more than the minimum required by the Fair Labor Standards Act. It is obvious that Berry has no claim in this case for further compensation for this particular work; but he bases his claim upon a consolidation of the work done by him for the Schroepfers as helper plus the hours worked by him Saturday night for the defendant. On the basis of this estimated aggregate of 84 weekly work hours in relation to the gross weekly compensation received from the Schroepfers and the defendant, he estimates his deficiency claim for compensation at $1836.85. The Schroepfers paid the social security tax for Berry as an employe.

9. All three plaintiffs were engaged solely in the distribution and sale of the defendant's newspapers in Baltimore City and the State of Maryland. They had no activity of any kind with respect to any of the papers sent by mail or otherwise outside the State. And, with the possible exception of the Saturday night work of Berry, none of the plaintiffs had any relation or activity with respect to the production of newspapers. The number of newspapers distributed and sold by all the rack-men to the whole paid circulation was about 4% to 5%.

10. In May 1941 the plaintiff, Fred Schroepfer, persuaded the rack-men to join the Newspaper Guild, a labor organization. As one of a committee of two representing the rack-men Fred Schroepfer conferred with the defendant's assistant business manager for change in their relations whereby the rack-men would obtain greater net returns from their activities. Mr. Kavanaugh for the defendant expressed a willingness to consider this request and to embody a modified financial arrangement in written contracts with each of the rackmen; but the latter declined to make any individual contracts on the ground that there was a rule of the Guild to the contrary. Later, on September 16, 1941, the fourteen rack-men presented a joint letter to Mr. Kavanaugh in which requests were made for specific changes in the financial arrangements. They asked to be paid 1¢ commission for the Sunday Sun sold by the rack-men, and a $15.00 weekly increase in car allowance. The latter increase was based on estimates of increased cost of automobile ownership and operation. Presumably this request was not granted for the same reason that applied in May 1941. Thereafter the rack-men conferred with the local representative of the Administrator of the Fair Labor Standards Act, and requested an investigation and ruling to the effect that the legal status of the rackmen under the Act was that of employes and not independent contractors. Thereafter on or about January 19, 1942, the local administrative official personally informed Mr. Kavanaugh that it was his opinion, and that he had accordingly recommended to the administrator of the Act, that the rack-men were employes of the defendant and entitled to the minimum hourly rate of compensation provided by sections 206 and 207 of the Act. Mr. Kavanaugh then inquired whether in view of that opinion the defendant would be regarded thereafter as violating the Act if the defendant continued the same relationship with the rack-men, and upon receiving an affirmative response, the defendant then at once wholly discontinued relations with the rack-men and abandoned any further distribution of papers to street vending machines. The sum of something over $100 was voluntarily paid by the defendant to each of the rack-men, in view of their current automobile purchase commitments.

The *conclusions of law* are: (1) the plaintiffs are not employes of the defendant within the scope and meaning and operation of the Fair Labor Standards Act; (2) the plaintiffs were not employed in inter-

state commerce or in the production of goods for commerce within the meaning of the Act; (3) and the complaint should be dismissed with taxable court costs.

### Opinion.

The Schroepfers say they were *employes* of the defendant but the latter calls them *independent contractors*. Which of these two labels is the more appropriate depends largely upon the point of approach. From the standpoint of economic position they would probably be called employes, while tested by the principles of contract law they were independent contractors. But in this case the relationship of the Schroepfers to the defendant must be determined from the intention of the Fair Labor Standards Act within constitutional limits. Section 203 of the Act defines "employer" and "employe" as follows:

"(d) 'Employer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee but shall not include the United States or any State or political subdivision of a State, or any labor organization (other than when acting as an employer), or anyone acting in the capacity of officer or agent of such labor organization.

"(e) 'Employee' includes any individual employed by an employer. . * * *

"(g) 'Employ' includes to suffer or permit to work".

Section 206, 29 U.S.C.A. reads:

"Every employer shall pay to each of his employees who is engaged in commerce or in the production of goods for commerce wages at the following rates—

"(1) during the first year from the effective date of this section, not less than 25 cents an hour,

"(2) during the next six years from such date, not less than 30 cents an hour".

Section 207 provides:

"(a) No employer shall, except as otherwise provided in this section, employ any of his employees who is engaged in commerce or in the production of goods for commerce—

"(1) for a workweek longer than forty-four hours during the first year from the effective date of this section,

"(2) for a workweek longer than forty-two hours during the second year from such date, or

"(3) for a workweek longer than forty hours after the expiration of the second year from such date, unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."

The statutory definitions of "employer", "employee", and "employ" are in very general terms, and should be understood in "their natural sense, and intended to describe the conventional relation of employer and employee". Robinson v. Baltimore & O. R. Co., 237 U.S. 84, 35 S.Ct. 491, 494, 59 L.Ed. 849; Divine v. Levy, D.C., 36 F.Supp. 55; Maddox v. Jones, D.C., 42 F.Supp. 35, 40. The definition is too general to expressly solve the particular problem. We must therefore look to the provisions of the Act as a whole to determine whether such a relationship as existed between the parties to this case constituted the Schroepfers employes of the defendant and thus entitled to the benefits of the Act. In this particular case the Schroepfers even by their own calculation of hourly compensation, received more than the minimum applicable rate for hourly services, and their claim is thus necessarily based only on section 207 (b) (3) which provides, where the work week is longer than the prescribed maximum, the employe must receive a minimum compensation for work time in excess thereof "at a rate not less than one and one-half times the regular rate at which he is employed." This statutory provision necessarily implies a kind of relationship based on contract or agreement between the employer and the employe from which it is possible to determine the *regular hourly rate* at which the employe is employed. In its simplest form the Act contemplates a situation in which an employer hires an employe at an hourly rate of pay, and requires or suffers or permits the employe to work only the maximum number of hours provided for in the applicable period. The hourly rate of pay must be equal to the minimum provided by the Act, and if the hours of work exceed the maximum, then the rate for overtime is one and one-half times the hourly rate. The Act thus contemplates (a) a situation in which the employer, expressly or impliedly, agrees to pay a certain sum to the employe, and (b) has the control and determination of the hours of work by the employe, because by 29 U.S.C.A. § 211(c) it is further provided that the employer must keep written records of

the number of hours of work by the employes respectively. If there is no express or implied agreement for an hourly rate of pay, but there is an agreement for a lump sum covering a particular period, as a week or month, the hourly rate may be determined by dividing the number of hours of actual work into the specified sum for the longer period. Overnight Motor Co. v. Missel, 316 U.S. 572, 62 S. Ct. 1216, 86 L.Ed. 1682; Walling, Adm'r, v. A. H. Belo Corp., 316 U.S. 624, 62 S. Ct. 1223, 86 L.Ed. 1716, and, even if there is no agreement to pay any sum, nevertheless if the employer accepts the benefit of work by an employe, the Act impliedly requires a minimum rate of pay for hourly services, and for overtime at one and one-half times the hourly or regular rate. The latter situation is illustrated by the so-called Red Cap (Railroad Station Porters) cases. Southern Railway Co. v. Black, 4 Cir., 127 F.2d 280; Williams v. Jacksonville Terminal Co., 315 U.S. 386, 62 S.Ct. 659, 86 L.Ed. 914. But in the present case the relationship between the parties does not fall within the scope of the Act because the agreement between the parties provided, not for compensation to be paid by the defendant for services performed by the plaintiffs, but for the net profits that might be realized by the plaintiffs from their sales of newspapers to the public, and the hours of work actually performed by the Schroepfers were not required by the defendant nor suffered nor permitted by it within the meaning of the Act, as they controlled their own hours of personal work. To determine the basis for overtime compensation it is essential to consider two factors, one, the rate of pay, and the other, hours of actual service, as controlled by the alleged employer. Neither factor exists in this case.

 Whether the defendant sued as an employer is within the scope of the Act, must be determined not necessarily from the mere name attributed by either the plaintiff or the defendant to their relationship, but rather upon the real nature and characteristic features of that relationship. In the instant case the contract or agreement between the Schroepfers and the defendant did not require from them personally any fixed or certain maximum or minimum hours of service, and did not promise them any gross or net compensation. Their gross receipts depended on the number of newspapers bought by the public through the vending machines. This in turn depended to some extent upon the regularity, timeliness and efficiency of their distribution of the papers, but also importantly on the public demand for purchase of the papers from the vending machines; and this varied from week to week and fluctuated considerably seasonally or at times of greater or less public interest in current events. Again the net profits from the business depended not only on the gross receipts but also on the expenses of the business. The latter were in the control of the plaintiffs and were affected materially by their economy in automobile maintenance and operation, and employment of a helper or helpers. And the other important necessary factor in determining their hourly rate of compensation was the number of hours which they personally worked; and this was in their own control. While the nature of the business possibly limited the amount of their own free time, in order to realize what they considered reasonable compensation, nevertheless, so far as the defendant was related to the matter, the plaintiffs had a free hand in determining how many hours they would personally respectively work. Thus the weekly hours of service and their net compensation, within the limit of the possibilities of the business, were determined by their own volition. In these circumstances it is not reasonable to conclude that the plaintiffs were employed by the defendant in the definition of "employ" in section 203(g), which "includes to suffer or permit to work". Whatever work was done by the plaintiffs was principally out of sight of the defendant and the extent of the hours of the plaintiffs' employment was not known to the defendant. Nor were the plaintiffs accountable to the defendant for their personal hours of service so long as their territory was adequately served by themselves or their own employes.

From the economic standpoint it may seem rather grandiose to call the plaintiffs independent contractors, but in legal principle that was their status rather than that of employes. It is true that the contract was not in writing and was terminable by either party at will, but while it lasted the arrangement had chiefly the earmarks which distinguish the independent contractor from the mere employe.

The substance of the relationship between the parties was that the plaintiffs were given the exclusive right to sell to the public through the street corner vending machines the defendant's newspapers, and what was required of them was only that they should keep the racks adequately supplied with the several editions of the daily papers, and buy and pay for at wholesale prices the papers taken by the public. The detailed manner in which the plaintiffs distributed the papers in their territory was not prescribed or controlled by the defendant. The plaintiffs used their own means of transportation, and employed and paid their helpers, and collected and owned the proceeds of sale, all without control or direction by the defendants. The whole expenses of their business were incurred and paid by the plaintiffs without contribution or interference by the defendant, with the exception of the weekly car allowance. The defendant was interested only in the result of the plaintiffs' activities (the distribution and sale of its papers) and not in the detailed means of distribution, and neither retained nor exercised control of the particular manner and means of accomplishing the result. The defendant made no agreement to compensate the plaintiffs at all other than by the weekly car allowance toward the plaintiffs' expenses of operation. In these circumstances the plaintiffs were independent contractors, rather than employes. 39 C. J. 1316; 2 C.J.S., Agency, § 2, p. 1027; Casement v. Brown, 148 U.S. 615, 622, 13 S.Ct. 672, 37 L.Ed. 582; Underwood v. Commissioner of Int.Rev. 4 Cir., 56 F.2d 67, 71. Davis v. General Acc. Fire & Life Assur. Corp., Tex.Civ.App., 127 S. W.2d 526, is a case on facts similar to the instant case, where a newspaper route carrier was held an independent contractor. Compare Hampton v. Macon News Printing Co., 64 Ga.App. 150, 12 S.E.2d 425, 431, and 432.

 There is another important reason for the nonliability of the defendant in this case. Sections 206 and 207 prescribe rates of minimum pay and maximum hours only for employes who are engaged in interstate commerce or in the production of goods for commerce. I do not think it can be successfully contended that the Schroepfers were engaged in the production of goods for commerce. The evidence shows that they had no part, however small, in the manufacture or production of the defendant's newspapers, either physically or by necessary relation. Nor did they touch in any way the distribution of the newspapers outside of Baltimore City and its immediate environs. Counsel for the plaintiffs does, however, seriously contend that the Schropfers were engaged in interstate commerce, because it is said they rendered service in the local distribution of the defendant's newspapers, constituting a material part of its whole enterprise including interstate commerce in obtaining raw materials, daily news and partially interstate distribution of newspapers. It is thus argued that even though the plaintiffs' particular activities were wholly intrastate they were at least a cog in the wheel of an interstate enterprise. I think the contention unsound as applied to the facts of this case. Jax Beer Co. v. Redfern, 5 Cir., 124 F.2d 172. There could hardly be a more purely intrastate activity than the sale of newspapers in a particular small part of a large city, especially where the newspaper is locally produced in the same city. If such an activity is interstate commerce, then seemingly the news boy who buys and sells these papers on the street corner, and the drug store which buys and sells them to its customers, are likewise engaged in interstate commerce. To extend the Act so far seems plainly to stretch beyond constitutional limits the power to regulate commerce between the States. Purely intrastate activities may not constitutionally be regulated by Congress unless they have some substantial effect on interstate commerce. United States v. Darby, 312 U.S. 100, 119, 657, 61 S.Ct. 451, 85 L.Ed. 609, 132 A.L.R. 1430; United States v. Wrightwood Dairy Co., 315 U.S. 110, 119, 62 S.Ct. 523, 86 L.Ed. 726. Moreover, as has often been pointed out, the expression of the congressional will is more broadly stated in the National Labor Relations Act, 29 U.S.C.A. § 151 et seq. which gives jurisdiction to the Labor Board in matters *affecting* interstate commerce, than in the Fair Labor Standards Act which regulates the pay of only those employes who are engaged in (interstate) commerce, or production of goods for interstate commerce. The factual contention that the Schroepfers were performing a part of the newspaper enterprise essential to the whole is seemingly clearly refuted by the fact in this case that the defendant terminated the whole system of sales by rack-men through vending ma-

chines, rather than yield to a ruling recommended by the Local Director to the Administrator of the Act. The evidence does not show what, if any, substitute has been adopted by the defendant to replace sales of papers through vending machines, but there is no suggestion that the abandonment of the vending machines has impaired the success of the newspaper enterprise.

Counsel for the plaintiffs relies strongly on two recent Supreme Court cases in support of the contention that his clients were engaged in interstate commerce. A. B. Kirschbaum Co. v. Walling, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638, and Warren-Bradshaw Drilling Co. v. Hall, Nov. 9, 1942, 63 S.Ct. 125, 87 L.Ed. ——. In the former the court held employes of a building or loft company (whose tenants were principally engaged in the manufacture or production of goods for interstate commerce) were engaged in the production of goods for commerce. Attention was called to the definition in section 203 (j) of the word "produce" which, as there defined, includes manufacturing, mining, handling, "or in any other manner worked on in any State", and also provides that "an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any process or occupation necessary to the production thereof, in any State." It was held that employes of the landlord building company such as engineers and firemen, elevator operators, and watchmen, were entitled to the benefits of the Act. And in the latter case it was likewise held that a driller of a Texas oil well who acted for the property owner as an independent contractor, was engaged in the production of goods for interstate commerce and his employes were entitled to the benefit of the Act. These cases are not controlling here. Both cases dealt with the question of whether the plaintiffs, admittedly employes, were engaged in the production of goods for commerce. Here, as has been pointed out, there is no substantial evidence that the plaintiffs were engaged in the production of goods for commerce, and the question is whether they were themselves engaged in interstate commerce. The benefits of the Act are given only to such employes as are themselves engaged in interstate commerce, even though the employer may in other activities be itself engaged in interstate commerce.

Counsel for the defendant also contends that even if the Schroepfers were otherwise within the Act they are nevertheless excluded by section 213(a) (1), 29 U.S.C.A. which provides: "The provisions of sections 206 and 207 of this title shall not apply with respect to (1) any employee employed in a bona fide * * * local retailing capacity, or in the capacity of outside salesman (as such terms are defined and delimited by regulations of the Administrator);". The applicable regulation is set out in the margin.[1] Counsel for the defendant refers to several administrative opinions or rulings

[1] "Section 541.4—Local retailing capacity.

"The term 'employee employed in a bona fide * * * local retailing capacity' in section 13(a) (1) of the act shall mean any employee—

"(A) who customarily and regularly is engaged in

"(1) making retail sales the greater part of which are in intrastate commerce; or

"(2) performing work immediately incidental thereto, such as the wrapping or delivery of packages, and

"(B) whose hours of work of the same nature as that performed by nonexempt employees do not exceed 20 percent of the number of hours worked in the workweek by such nonexempt employees.

"Section 541.5—Outside salesman.

"The term 'employee employed * * * in the capacity of outside salesman' in section 13(a) (1) of the act shall mean any employee—

"(A) who is employed for the purpose of and who is customarily and regularly engaged away from his employer's place or places of business in

"(1) making sales within the meaning of section 3(k) of the act; or

"(2) obtaining orders or contracts for the use of facilities for which a consideration will be paid by the client or customer, and

"(B) whose hours of work of the same nature as that performed by nonexempt employees do not exceed 20 percent of the number of hours worked in the workweek by such nonexempt employees; provided that work performed incidental to and in conjunction with the *employee's own outside* sales or solicitations, including incidental deliveries and collections, shall not be regarded as nonexempt work."

98

which tend to support his contention on this point. Jewel Tea Co. v. Williams, 10 Cir., 118 F.2d 202, also supports it. However, it is unnecessary to rule upon this particular contention in view of the conclusions heretofore reached on other questions.

 The case of the third plaintiff, Abraham Berry, calls for but little comment. To the extent that he was employed by the defendant he received compensation in excess of the minimum hourly rate prescribed by the Act, and did not work more than the maximum hours. His claim is, however, based on an attempted consolidation of his hours of employment by the defendant with his hours of employment by the Schroepfers. As a result of this combination he asserts that he was engaged in the defendant's employ for hours in excess of the maximum per week, and received less compensation at an hourly rate, and at an overtime rate, than the minima required by the Act. The short answer to his claim is that his work for the Schroepfers as helper was not an employment by the defendant at all. He was never on the payroll of the defendant, except for his Saturday night work. The Schroepfers were not required by the defendant to employ him, and the defendant had no knowledge, other than possibly very casual, of the fact that he was employed by the Schroepfers or for what hours of service or rate of pay. Counsel for Berry seeks to support his contention by the citation of cases drawn from the field of torts, to the effect that where an employe engages the help or services of an assistant to the knowledge of the employer, the latter becomes liable for the actions of the assistant employe. But such cases seem clearly inapplicable to Berry's present claim, which necessarily lies in the quite different legal field of contracts.

In a number of cases arising under the Fair Labor Standards Act involving facts generally similar to the instant case, it has been quite uniformly held that one in the situation of Berry was not entitled to overtime pay from a defendant who had not employed him. Bowman v. Pace Co., 5 Cir., 119 F.2d 858; Whatley v. Great Southern Trucking Co., 5 Cir., 123 F.2d 143; Auto Banking Corp. v. Willison, Md., November 18, 1942, 28 A.2d 864. The last cited case contains a comprehensive review of cases both federal and state on the particular point.

For these reasons I have concluded that the plaintiffs are not entitled to recover in this case, and the clerk is instructed to enter judgment for the defendant.