**BRACEY et al. v. LURAY.**

**GROSSMAN v. SAME.**

Civil Actions Nos. 1744, 1786.

District Court, D. Maryland.

March 13, 1943.

Harry E. Goertz and Joseph Loeffler, both of Baltimore, Md., for plaintiffs.

Louis Samuels and William Saxon, both of Baltimore, Md., for defendant.

WILLIAM C. COLEMAN, District Judge.

These cases arise under the Fair Labor Standards Act, 29 U.S.C.A. §§ 201–21⁰ inclusive.

The plaintiffs are twelve employees of the defendant company, which is engaged in the scrap iron and metal business in Baltimore. Whether any or all of these plaintiffs are entitled to invoke the provisions of this Act depends upon the character of their own labor, and not upon the character of any business which the defendant company may have engaged in, apart from the actual work of these plaintiffs. That is to say, we are concerned here with what the plaintiffs did, not with any other aspect of the business of the company that lay outside of their activities. Overstreet v. North Shore Corporation, 63 S.Ct. 494, 87 L.Ed. ——, decided by the Supreme Court, February 1, 1943, and cases cited. And we are concerned only with the character of their labor during the period for which they are seeking additional compensation under the Act, that period being from October 24, 1938, to September 17, 1942, inclusive.

It, therefore, becomes necessary at the very outset of the present inquiry to have clearly before us the scope of the Fair Labor Standards Act as respects employees. The Act is made applicable to any employee "who is engaged in commerce or in the production of goods for commerce." Section 7(a), 29 U.S.C.A. § 207(a). "Commerce" is defined as "trade, commerce, transportation, transmission, or communication among the several States or from any State to any place outside thereof." Section 3(b), 29 U.S.C.A. § 203 (b). "Produced" is defined as "produced, manufactured, mined, handled, or in any other manner worked on in any State; and for the purposes of this chapter an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any process or occupation necessary to the production thereof, in any State." Section 3 (j), 29 U.S.C.A. § 203(j).

We turn then to a consideration of what work these plaintiffs performed during the period in question, which requires at least a brief statement of the defendant's business as a whole.

The defendant's company did a gross business of from $125,000 to $150,000 a year, on the average, during the period in suit. During this period—approximately four years—its total business involving sales that were directly interstate, that is to say, sales which it itself made to parties outside the State of Maryland, amounted to something less than $20,000. Therefore, these gross sales averaged per year only approximately $5,000, or less than 4% of the defendant's total annual gross business. During this entire period the defendant bought at points outside of the State and hauled into the State only about $1,000 worth of scrap which the various plaintiffs handled in one way or another, that is, they piled, cut and assorted it, and reloaded it into cars and trucks. Since the plaintiffs all participated, in one form or another, in such work in connection with both the interstate purchases and the interstate sales just referred to, we must hold that to this extent they were clearly engaged in commerce within the meaning of the Act and are entitled to its benefits to the extent that the amount of their labor in such work can be segregated and determined. The fact that this interstate business of the defendant, in which plaintiffs participated, was such a small part of defendant's total business is not the test. In a very recent case by the

Court of Appeals of this Circuit, Davis v. Goodman Lumber Co., 4 Cir., 133 F.2d 52, 54, decided February 2nd, the Court said, after reviewing Supreme Court and other decisions, that: "These decisions lead us to conclude that the employees engaged in the manufacturing business of the Goodman Company were entitled to the protection of the statutory standards, although by far the greater part of the corporation's business consisted of a retail establishment chiefly engaged in intrastate commerce, whose employees were exempt from the wage and hour provisions of the Act. The propriety of applying the Act to a separate and distinct department of an employer's business while recognizing that another part is exempt from the statute, has been recognized in similar situations. * * *"

We now turn to consider whether the plaintiffs are also entitled to invoke the Fair Labor Standards Act with respect to the other, and by far the larger part of defendant's business in which they were involved, as follows: Scrap iron and other metals of all kinds were delivered to the defendant in small lots by peddlers, all such deliveries being from points within the State of Maryland. The plaintiffs assorted and otherwise prepared—which sometimes required cutting—the scrap for loading and assisted in loading it into railroad cars, for the most part, which were spotted either in defendant's yard or on Pennsylvania Railroad sidings near by; and occasionally it was loaded into trucks for shipment to twelve firms that were wholesalers of scrap iron and metal. There was no "processing" of the scrap as that term is generally understood. In addition, there were occasionally small sales to individual consumers, which did not exceed in all $3,500 a year during the period in question. All of these latter consignees, that is to say, these small individual consumers, and also all of the twelve firms just referred to, were located within the State of Maryland. They always paid the freight, deducting it from the purchase price paid to the defendant who had no dealings with the railroad with respect to these shipments. The bills of lading read: "shipper's load and count." Most of them contained the notation: "scrap iron for remelting purposes only;" some, "scrap iron for export only," and the shipments were consigned to large industrial or shipbuilding plants, all within the State of Maryland. There were no billings to any points beyond the State. Nevertheless,

plaintiffs claim that because only three of these twelve firms were themselves consumers of the scrap, and ordered and received during the entire period in suit not more than a total of $6,000 worth of it, as compared with from $125,000 to $150,000 worth which the other nine firms received, therefore, the shipments to the latter firms are to be treated as interstate, because the purchasers shipped and sold the scrap directly to the large steel and shipbuilding plants, and because at these plants a large part of the scrap was fabricated into material that went into ships, or other finished products, which moved out of Maryland, mostly in connection with the war effort, as defendant knew it would do.

Defendant contests this argument of plaintiffs on two grounds: First, that he is a retailer and, therefore, entitled to exemption under the provisions of the Fair Labor Standards Act relating to retailers, 29 U.S.C.A. § 213(a), 1 & 2, and, second, that since the consignment of these shipments in every case was to a local consignee for a destination within the State, the shipments must be treated as intrastate, and that it is an extravagant and unwarranted stretching of the law to say that they are interstate merely because the scrap, although bought from him by local wholesalers, was being sold to large industrial plants by which it was fabricated into material that went into ships or into other things that in due course moved in interstate or foreign commerce.

Turning then, first, to the question whether defendant is exempt as a retailer under the provisions of the Act itself, those provisions are as follows, Sec. 13(a), 29 U.S.C.A. § 213(a): "The provisions of sections 206 and 207 of this title shall not apply with respect to (1), any employee employed in a bona fide * * * local retailing capacity * * * (as such terms are defined and delimited by regulations of the Administrator); or (2) any employee engaged in any retail or service establishment the greater part of whose selling or servicing is in intrastate commerce; * * *."

The applicable regulation of the Administrator is as follows: "Section 541(4)—Local retailing capacity. The term 'employee employed in a bona fide local retailing capacity' in section 213(a) 1 of the Act shall mean any employee (A) who customarily and regularly is engaged in (1) making retail sales, the greater part of

which are in intrastate commerce; or (2) performing work immediately incidental thereto, such as the wrapping or delivery of packages, and (B) whose hours of work of the same nature as that performed by non-exempt employees do not exceed 20 per cent of the number of hours worked in the work week by such non-exempt employee."

Defendant claims that he is a retailer and supports that contention through the fact, which is undisputed, that he is so classified by the City of Baltimore and pays each year the requisite municipal retailer's license fee. He claims that his large purchasers, to whom reference has already been made, i.e. those who bought for shipment to the large industrial and shipbuilding plants, principal among which is H. Klaff & Company, Inc., are wholesalers and are so classified by the local law. However, we do not think that this is conclusive for the purpose of the federal Act. The word "retail" or "retailing" is not itself defined by the Act or regulations but given its common and ordinary acceptation, when used in sales parlance, it means a sale in small quantity direct to the consumer, as distinguished from the word "wholesale", meaning a sale in large quantity to one who intends to resell. In the present case we do not believe that the defendant meets that definition. See White Motor Co. v. Littleton, 5 Cir., 124 F.2d 92; Great Atlantic & Pacific Tea Co. v. Cream of Wheat Co., 2 Cir., 227 F. 46. However, merely because defendant is not entitled to exemption from the provisions of the Act on this ground does not necessarily mean—and this is the real question in the present case,—that the present plaintiffs were actually "engaged in commerce or in the production of goods for commerce" during the period in question.

Plaintiffs rely to a large extent upon the case of S. H. Robinson & Co. v. Larue, Tenn.App., 156 S.W.2d 359, and Id., 178 Tenn. 197, 156 S.W.2d 432, decisions of the Court of Appeals and the Supreme Court of Tennessee. There the plaintiff was a night watchman employed at a junk yard where junk was deposited and graded in preparation for reshipment. The Court of Appeals said (156 S.W.2d at page 360): "This court concurs in the conclusion that the defendant's business was interstate. Its yards where the junk was deposited and graded in preparation for

reshipment covered a city block, and the metal was shipped in carload lots. *Some of the shipments were interstate and some were intrastate,* but the character of the product collected and sold was such that its use was primarily for munitions of war, and the demand for the scrap was not local or state use, other than its preparation for munition purposes. In war times, as this is, scrap metal of iron, aluminum, brass and copper is a commodity intended to pass interstate and foreign commerce. He who deals extensively in it can neither hope for nor expect a local market, because, first, there is no local use for it and, second, the local market cannot outbid a foreign or national market." (Italics inserted.) The highest court of the state, the Supreme Court, accepted this finding with the following brief statement (156 S.W.2d at page 433): "The trial court and the Court of Appeals, 156 S.W.2d 359, have concurred in finding that it [the employer] is engaged in shipping these materials in *interstate commerce,* and we find evidence in the record to support that finding." (Italics inserted.) It is to be noted that in this case the employer himself shipped interstate apparently to a considerable extent although the disclosure of the precise facts is very meager—in other words, he dealt directly with out-of-state purchasers and consignees.

Plaintiffs also rely upon the case of Walling v. Pielet Scrap Iron & Metal Company, an unreported decision of the District Court for the Northern District of Illinois, Eastern Division, decided July 3, 1942, but there, also, it is apparent from the decision that the employer himself shipped mostly interstate. The Court said: "The company salvages and removes all types of metal from buildings in a state of demolition. After removal of scrap metal from buildings by its employees, the metal is cut to certain sizes, either at the site of removal or in its yard. The metal is then graded and sorted in its yard. It sold 95 per cent of its scrap metal in Chicago to a scrap metal broker who gave it shipping instructions for shipment of metal by it to specified steel mills. Its employees would load the scrap metal on railroad cars adjacent to its yard. *The greater part of such shipments were to points outside of the State of Illinois."* (Italics inserted.)

Another case upon which plaintiffs also largely rely is Enterprise Box Co. v. Fleming, 5 Cir., 125 F.2d 897. There, the employer was engaged in the manufacture

and sale of cigar boxes. All of its manufacturing was done within the State of Florida and all of its sales were made to cigar manufacturers within the State, but they distributed most of their cigars in interstate commerce and the employer was held to have been engaged in the "production of goods for commerce."

The cigar case just referred to is to be differentiated from the present case, quite apart from the question of "production", on the ground (1) that the employer, unlike the employer in the present case, itself actually sold the articles direct to an interstate shipper; and (2) that most of such articles flowed as such, i.e., as boxes in commerce, whereas in the present case, the articles did not as such, namely, in the condition they were when they left the hands of the present petitioners, ever flow in commerce, except as to a fraction of the scrap unidentified which may have been shipped out of the port of Baltimore in its original state. That is to say, in the present case, with the exception just referred to, the scrap had first to be remelted and then fabricated into shipbuilding or other material, thus completely losing its identity, and then, and only then, as part of a vessel, munitions, etc., can we assume that it flowed in commerce and this assumption is not and cannot be, with any degree of accuracy, supported by proof as to just what became of this or that carload of scrap. For all that appears, none of the particular carload lots referred to in the present case has ever been remelted or exported. However, for the purposes of the present case this is not of controlling importance. We may assume the scrap to be within the broad definition of "goods" contained in the Act (Sec. 3(i), 29 U.S.C.A. § 203(i). The fact that is controlling is that the present plaintiffs neither "produced" it within the meaning of the Act, nor had anything to do, except most remotely, with any of the stages of transportation which may have put any of the goods in commerce as defined by the Act.

It is to be noted that the Fair Labor Standards Act does not apply to those engaged in work merely because it may *affect* commerce, but, as has already been pointed out, they must actually be engaged in commerce or in the production of goods for commerce—meaning interstate commerce. In other words, this law, unlike the National Labor Relations Act (29 U.S.C.A. §§ 151–166), does not extend federal jurisdiction to any act affecting commerce. When the House passed the Bill, it applied to employers "engaged in commerce in any industry affecting commerce" but the Bill recommended by the conference applied only to employees "engaged in commerce or in the production of goods for commerce." See Kirschbaum Co. v. Walling, 316 U.S. 517, 522, 62 S.Ct. 1116, 1120, 86 L.Ed. 1638; and to the same effect, Higgins v. Carr Bros. Co., 63 S.Ct. 337, 87 L.Ed. ——, Supreme Court, decided January 18, 1943.

It is also to be noted that we are not concerned here with a case of interstate movement of goods from a manufacturer to a dealer or consumer; or with interstate movement of goods from a manufacturer to a dealer and then on to another dealer or consumer, where the latter is in the same State as the first dealer. Such situations were considered in Walling v. Jacksonville Paper Co., 63 S.Ct. 332, 87 L.Ed. ——, and Higgins v. Carr Bros. Co., supra, both decided by the Supreme Court on January 18th, 1943. These cases are but the inevitable extension of the doctrine announced a short time previously in Kirschbaum v. Walling, supra, to the effect that employees who have a close and important tie with a process of production for commerce are to be regarded as engaged in an occupation "necessary to the production of goods for commerce." (316 U.S. 517, 526, 62 S.Ct. 1116, 1121, 86 L.Ed. 1638).

As we have seen, Congress has broadly defined the term "produced" and has provided that "an employee shall be deemed to have been engaged in the *production* of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any process or occupation necessary to the production thereof, in any State." We may assume that if the word "handling" used in the foregoing had relation to "transportation" as such, and not to "production", what the employees in the present case did by way of unloading, assorting and reloading the scrap in or about their employer's yard, would form a part of "transportation", but note that "transportation" when used to define "commerce" is not given the same broad scope in the Act as is "production." We reiterate that the Act does not apply to those engaged in work merely because their work may *"affect"* commerce, but they must be *"engaged in commerce,"* if they are not engaged in the production of goods

for commerce, in order to fall within the provisions of the Act. For the latest expression of the Supreme Court on the scope of the phrase "engaged in commerce" as used in the Act, see Overstreet v. North Shore Corporation, supra.

Thus, although extremely far-reaching as undoubtedly is the decision of the Supreme Court in Warren-Bradshaw Drilling Co. v. Hall, 317 U.S. 88, 63 S.Ct. 125, 87 L.Ed. ——, decided November 9, 1942, we feel that it does not destroy the distinction here made. In that case, it was held that employees of an independent contractor engaged in drilling oil wells were working in the "production of goods for commerce" within the meaning of the Act, since (as the Court said, 317 U.S. 88, 63 S.Ct. at page 127, 87 L.Ed. ——) "the Act extends at least to the employer who expects goods to move in interstate commerce. United States v. Darby [infra]. Assuming that such expectation, or a reasonable basis therefor, was necessary on petitioner's part before the application of the Act to petitioner, it is here present. The record contains ample indication that there were reasonable grounds for petitioner to anticipate, at the time of drilling, that oil produced by the wells drilled would move into other states. Petitioner, closely identified as it is with the business of oil production, cannot escape the impact of the Act by a transparent claim of ignorance of the interstate character of the Texas oil industry." Neither this case nor United States v. Darby, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609, 132 A.L.R. 1430, relied upon, is, we think, to be taken as a ruling that the Act extends to employees such as the plaintiffs here, who are not engaged in any production or in any interstate commerce, merely because at the time they assorted and loaded goods for shipment to local consignees their employer knew and they may have known, through hearsay, that the scrap, or a large part of it, was ultimately to move out of Maryland, as part of a ship, or what not.

Although, of course, we are bound by the ruling of the majority of the Court in Warren-Bradshaw Drilling Co. v. Hall, supra, we believe it not inappropriate to quote from the dissenting opinion of Mr. Justice Roberts in that case as follows (317 U.S. 88, 63 S.Ct. at page 128, 87 L.Ed. ——), because we believe this quotation aptly answers the attempt of the present plaintiffs to extend the Act to embrace the present case:

"This [the reasoning of the majority opinion] is to ignore all practical distinction between what is parochial and what is national. It is but the application to the practical affairs of life of a philosophic and impractical test. It is but to repeat, in another form, the old story of the pebble thrown into the pool, and the theoretically infinite extent of the resulting waves, albeit too tiny to be seen or felt by the exercise of one's senses. * * *

"I think Congress could not and did not intend to exert its granted power over interstate commerce upon what in practice and common understanding is purely local activity, on the pretext that everything everybody does is a contributing cause to the existence of commerce between the states, and in that sense necessary to its existence."

The facts in Rogers v. Glazer, D.C., 32 F.Supp. 990, are quite like those in the present case. There, the employer was engaged in the business of buying old automobiles which had been wrecked, or burned; in dismantling them and selling, at retail, parts taken from them, and incidentally, in selling scrap which remained, with knowledge that some of the scrap and products manufactured therefrom would pass into interstate commerce. A watchman employed by him to protect the scrap from depredation by thieves while on the employer's business premises was held not to come under the provisions of the Act. Such case is obviously unlike cases such as Lefevers v. General Export Iron & Metal Co., D.C., 36 F.Supp. 838, involving watchmen, because in the latter, it was undisputed that the junk dealer was engaged in "commerce" and in "production of goods for commerce."

In Barbe v. Cummins Construction Co., D.C., 49 F.Supp. 168, decided March 8, 1943, Judge Chesnut has applied the same principle we here adopt and has reached the same conclusion, although the facts in that case are different.

To summarize, we believe that to adopt plaintiffs' contention in the present case would result in leaving no form of local activity which could not, by the same argument, be brought under the scope of the act.

If the Supreme Court, by its decision in Warren-Bradshaw Drilling Co. v. Hall, supra, or in any other of its decisions; or if the Circuit Court of Appeals for this Circuit, in any of its decisions, intends that

what is there said shall be interpreted as extending the Fair Labor Standards Act so as to embrace the employment of the plaintiffs in the present case, we do not so understand it, and before thus extending the application of the Act, we must await a declaration by one or the other of these tribunals to that effect.

For the reasons stated herein, any judgment for plaintiffs would, of necessity, be limited to amounts that might be found to be due them by reason of their hours of labor spent in connection with (1) trucking scrap to defendant's place of business from points outside the State; and (2) preparing for transporting or transporting scrap from defendant's place of business to purchasers outside the State of Maryland. However, since plaintiffs have failed to submit any testimony from which such hours of labor could possibly be computed, although afforded full opportunity to do so if such were possible, judgment must therefore be for the defendant, plaintiffs to pay the costs.