**LING et al. v. CURRIER LUMBER CO.**

No. 3378.

District Court, E. D. Michigan, S. D.

April 2, 1943.

Roy W. Bonam and Allen H. Blondy, both of Detroit, Mich., for plaintiff.

Fildew & De Gree, of Detroit, Mich., for defendant.

PICARD, District Judge.

This is an action brought by 37 employees of Currier Lumber Company for time and one-half under the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq. The facts are these:

Currier Lumber Company is engaged in the retail and wholesale, as well as the manufacture through its mill, of various lumber and building products. It is one of the large furnishers of building materials in Detroit. It sells to the retail trade, manufactures doors, sash, frames, etc., and furnishes a number of contractors and builders at wholesale. It sells Sears and Roebuck and Montgomery Ward, but whether any of this business goes into other states or comes from outside Michigan does not appear definitely from the testimony.

In 1938, just before the Fair Labor Standards Act went into effect, Weatherproof Window, Inc., was organized and it is the claim of Patrick J. Currier, president and chief stockholder of Currier Lumber Company, that he gave his son $25,000 to form this new company which he says was entirely separate and distinct from Currier.

The testimony showed that the son to whom P. J. Currier is supposed to have given the $25,000 never received over $2,000, but Weatherproof did get about $125,000 in lumber and manufactured goods from Currier Lumber Company. This latter was a book entry. In addition, it appears that the son was only twenty-one years of age; had not been a great success in school and knew almost nothing about the lumber business. All employees of Weatherproof Window were employees taken right out of or still associated with Currier Lumber Company. The Weatherproof office was equipped with furniture taken from Currier Lumber Company. Its bookkeeper came from Currier Lumber Company. All its mill work was done by Currier Lumber Company. In fact, counsel for Currier Lumber Company quickly abandoned any semblance of claim that Weatherproof Window was a separate concern but continued to maintain that Weatherproof was Currier Lumber Company's vehicle for "segregation of its out of state business". He insisted that formation of the new company was an attempt on Currier's part to "comply" with the law rather than "circumvent" it, as suggested by the court at an early stage in the proceedings. The court would have more confidence in this position of defendant were it not for the fact that Mr. P. J. Currier himself stated that when he gave the $25,000 to his son and Weatherproof was formed, he'd never heard of the Wages and Hours or Fair Labor Standards Act so he could not possibly have been trying to comply with a law concerning which he had never been informed. In addition, every succeeding step in the saga of Weatherproof was evidence of the subsidiary nature of its affiliation. However, we find it unnecessary to decide that point, but we do determine that Currier owned Weatherproof Window, Inc., and controlled its every movement during its entire existence. The motive or "why" it was formed is immaterial because Currier Lumber Company did have a right to segregate its interstate from its intrastate business. Whether or not it accomplished this will be discussed later.

From the testimony it appears that:

(a) Currier Lumber Company employed about 348 men in its mill.

8 (b) Of the 17 known employees of Weatherproof, eight of them (plaintiffs say not more than 3) worked in the Currier mill, devoted the greater part of their time to Weatherproof products and were paid time and one-half during the entire period in question. (We will comment on this below.)

37 (c) The 37 plaintiffs worked in the Currier Mill and claim that they worked "part of each day of each week" on Weatherproof products and on orders for Montgomery Ward, Sears-Roebuck and the Cincinnati firm of the Pease Lumber Company;

33 (d) Thirty-three other Currier men who worked in the mill during the period in question started an action against Currier before the suit at bar was instituted, also claiming that they had worked on interstate orders. That law suit was settled. According to defendant's counsel, Currier "bought them off because Currier had received a government contract and would not be permitted to fill the order while it was having labor trouble";

70 (e) An additional seventy other Currier men who worked in the mill between the effective date of the act, October 1st, 1938 and December 1st, 1939, now have suits pending against the company also based chiefly on work they claim they did "on Weatherproof and other interstate orders";

200 (f) This leaves about 200 of the Currier mill employees who so far have brought no suit against Currier for time and one-half on the claim that they also "worked on Weatherproof and interstate products", although it was stated in open court that our decision might have the effect of inviting suits by all the other employees of Currier who worked in the mill.

348 Total

This court does not, in this opinion, take possible suits or threats into consideration. However, we cannot ignore the official record which at this point indicates that about

41 mill employees of Currier Lumber Company have been treated as beneficiaries of the Fair Labor Standards Act and have been compensated time and one-half for overtime on Weatherproof orders; that 37 more are represented in this suit and 70 others in other suits pending asking the same consideration; so that in short, so far, about 148 men claim to have worked part of each day of each week on Weatherproof and other interstate orders of Currier of which Weatherproof's total was $125,000 from the effective date of the Wages and Hours Act, October 1, 1938, to December 1, 1939. Weatherproof's total sales during the time were $215,000—70 percent of which went out of the state.

Commenting on "(b)" above, plaintiffs claim that even those employees of Weatherproof (plaintiffs say 3; defendant says at least 8) never worked more than 10 percent of their time on Weatherproof orders alone, but were working most of the time on Currier routine orders. In this connection, this court, although requesting the information from defendant, Currier Lumber Company, was shown no evidence as to what proportion of any employee's time, whether segregated as Weatherproof workers or not, was devoted to Weatherproof orders. As a matter of fact, defendant's records are far from complete.

Here are some additional facts: During the period in question which includes from the beginning of the act to December 1, 1939, the mill work of Currier Lumber Company amounted to about $2,770,000; its total manufacturing and retail business reached $4,664,000 and its wholesale business about $780,000. Its out-of-state business, therefore, was infinitesimal compared to the whole. This cannot be denied. In fact, its Weatherproof business was less than 1/20th of the total mill out-put. Therefore in supporting its position that there "was a segregation of the Weatherproof business", defendant reasons that if we were to divide the total mill work figure $2,770,000 above by the number of employees working in the mill, to-wit 348, that that would average about $8,000 production value per man and that since only 70 percent of the manufactured Weatherproof products were sold interstate ($87,500) that then the complete time of only 10 or 11 men was all that would have been required to fill all Weatherproof out-of-state orders. To this, defendant counsel adds, that since claim that at least 8 men actually worked all of their time on Weatherproof orders, that the remaining $24,000, or so divided among the 37 employees here plaintiff, would have been so meager as to make it ridiculous to hold that these workmen were entitled to time and one-half for overtime.

However, there is nothing in the evidence to show that the 8 men did devote all their time to Weatherproof orders. In truth, there is evidence to the contrary and the fact that 33 other employees have already settled with Currier on its wage dispute basing their action on a claim of having worked on Weatherproof orders lends some substance to plaintiffs' position that the entire scheme was one to circumvent the Wages and Hours law; that the segregation was a farce; that Weatherproof was a dummy company set up to give a semblance of compliance with the Fair Labor Standards Act and that not only the workmen who admittedly operated the machines and milled the lumber for Weatherproof were engaged in interstate commerce, but that the 37 employees here contending contributed to the production of goods for interstate commerce. There is also no substantial evidence of just what Weatherproof products went out-state and what remained in the state.

A stipulation was entered into between the parties that the testimony of a comparatively few employees would be taken and that if all the other employees of Currier who were plaintiffs were called they would testify to practically the same facts as those whose testimonies were taken.

Defendant's position therefore is:

(a) That there was a complete segregation of work that went to Weatherproof Window, Inc. through Currier Lumber Company;

(b) That possibly now and then some plaintiffs might have worked on products that went out of the state but that those instances were few and far between, if at all;

(c) That plaintiffs have not proved that they did work on any of those products, or if they have that the "de minimis non" rule should apply;

(d) That those plaintiffs did not contribute a "substantial" part of their time to production of goods in interstate commerce; and

(e) That since all Weatherproof Window Inc.'s work didn't amount to more than 3

percent of the entire mill out-put of Currier Lumber Company the "de minimis non" rule would apply.

Plaintiffs claim that the exemption in the act does not apply to defendant because defendant was a manufacturer and when a manufacturer sells any part of its products in interstate commerce, all of its employees who participated at all in producing those goods, are entitled to recover under the Wages and Hours Act. Plaintiffs further state that since the evidence shows that plaintiffs did participate in the manufacture of goods for Weatherproof, that it was incumbent upon Currier Lumber Company to prove that those men were engaged in producing only the 30 percent part of Weatherproof sales made intrastate; that it was up to defendant company to keep those records and that all information of this nature is still exclusively in the hands of defendant and cannot be ascertained by plaintiffs.

Defendant contends that the burden of proof is always on plaintiffs but that if this is its burden it has met the requirement by proving segregation of its Weatherproof business.

The question for this court to decide then is simply this—

Where an employer has attempted to segregate from its intrastate business that part of its manufacturing business devoted to interstate commerce, do those employees who are able to show that their labors during at least a very small part of each week helped produce goods for the segregated company, come under the Wages and Hours Act, or does the rule of "de minimis non curat lex" apply?

## The Law

This court has given considerable time to the several decisions interpreting the controlling applicable features of the Fair Labor Standards Act and finds that those decisions are not in complete harmony. On the other hand one is able to discern a certain consistency in the opinions of the appellate courts that definitely clarifies certain phases of that act. In United States v. Darby, 312 U.S. 100, 61 S.Ct. 451, 461, 85 L.Ed. 609, 132 A.L.R. 1430, Chief Justice Stone states: "Congress, to attain its objective in the suppression of nationwide competition in interstate commerce by goods produced under substandard labor conditions, *has made no distinction as to the volume or amount of shipments in the commerce or of production for commerce by any particular shipper or producer*. It recognized that in present day industry, competition by a small part may affect the whole and that the total effect of the competition of many small producers may be great". (Italics ours)

We must note the language—"has made no distinction as to the volume or amount of shipments", etc., which in our opinion settles this phase of the question.

■ Here we have the "de minimis non" doctrine in reverse for the court in effect says, "whether the volume be big or little, if it is interstate business the Fair Labor Standards Act applies".

But still there are admittedly a number of cases that seemingly apply the "de minimis non curat lex" doctrine which upon examination reveal two well settled doctrines:

(a) That the court does not consider an employer as engaged in interstate business if the interstate part of his business consists of a "casual, isolated or occasional sale" Goldberg v. Worman, D.C., 37 F.Supp. 778; Whitson v. Wexler, 3 Labor cases, page 60859.

And (b) Protection of the act is not extended to employees of employer engaged in intrastate commerce unless the employee is able to free himself from the shackles of that exemption by proving a substantial part of his labors as contributing to production of goods for interstate commerce. United States v. Darby, supra; Metcalfe Walling v. Jacksonville Paper Company, October term, 1942, 63 S.Ct. 332, decided January 18, 1943; Jax Beer Co. v. Redfern, 5 Cir., 124 F.2d 172.

■ In other words, where a company is admittedly engaged in interstate commerce, every employee who contributes to the production of goods for the interstate commerce of that company comes under the Fair Labor Standards Act, but where a company is engaged in intrastate commerce and has an isolated or casual connection with interstate commerce, the de minimis non doctrine applies. Yet even in those instances any employee of such a company who is able to show that a substantial part of his labors during any one week or weeks was utilized in interstate commerce that employee could be the bene-

ficiary of the Fair Labor Standards Act for those weeks.

Therein lies the distinction and in our opinion it is now generally accepted that when even less than one percent of one's business is in interstate commerce, that business is subject to the Fair Labor Standards Act, unless that "less than one percent" was a casual or isolated sale.

In the case at bar it is admitted that Currier Lumber Company because of its Weatherproof business is engaged in interstate commerce. First, $125,000 worth of mill work for just one customer is substantial, and second, these were not casual or isolated sales. The rule "de minimis non curat lex" is not therefore the criterion.

But defendant contends that if any of these plaintiffs aided in the production of goods for interstate commerce, it was casual, infinitesimal, spasmodic and occasional, and since Currier Lumber Company's mill is primarily a retail establishment (though of a manufacturing status), then those 37 employee plaintiffs must prove that they worked a substantial part of their time on products sold in interstate commerce; that the burden of proof is on them and that the "de minimis non curat lex" doctrine does apply to them as an exception to an exempt class—to-wit the retail manufacturer doing most of its business intrastate.

In this connection defendant relies on Walling v. Jacksonville Paper Company, supra, decided by the Supreme Court of the United States January 18, 1943, where Justice Douglas uses this language [63 S.Ct. 337]: "The fact that all of respondent's business is not shown to have an interstate character is not important. The applicability of the Act is dependent on the character of the employees' work. Kirschbaum Co. v. Walling, supra, 316 U.S. at page 524, 62 S.Ct. at page 1120, 86 L.Ed. 1638. If a substantial part of an employee's activities related to goods whose movement in the channels of interstate commerce was established by the test we have described, he is covered by the Act."

By the above it must be appreciated that an employer may have some employees subject to the act while others are not. We also must note the use of the word "substantial" by our Supreme Court. It has given this court reason to pause. Nevertheless, in our opinion, the quotation from the Jacksonville Paper case does not control the question before us. When we consider that the "de minimis non" doctrine was undoubtedly adopted by our courts to save the Fair Labor Standards Act from ridiculous interpretation we then get right back to the distinction above noted, to-wit, we are again impressed by the fact that the several cases cited by defendant all have as their objective the question of whether the employer is or is not engaged in interstate commerce. That question is not before us in this case because here defendant is admittedly so engaged. If the employer has a retail establishment or has a business that is entirely intrastate, then any employee who claimed to come under the Wages and Hours division of the Fair Labor Standards Act would have to show that a substantial part of his time was devoted to interstate commerce. Here the Jacksonville Paper Company case, supra, applies. But to hold that every employee of an employer admittedly engaged in interstate commerce must prove that a substantial part of his time was devoted to interstate commerce would open the door wide for fraud on the part of the unethical employer. The unprincipled employer could circumvent the Wages and Hours law with scandalous impunity. As a matter of fact, no case illustrates this possibility more than the case at bar for we can easily conceive that if all 348 Currier mill employees did "just a little" work on Weatherproof goods, then under defendant's theory, not a single one of those employees could take advantage of the Fair Labor Standards Act because "no substantial part of his work was devoted to the production of goods sold in interstate commerce." Yet the company itself would be admittedly in interstate commerce in competition with known products by more scrupulous employers. And plaintiffs' counsels argued strenuously in open court that the above hypothetical case is not suppositional in the least. They contend that the above is just exactly what Currier Lumber Company tried to do in this case.

Well, it may be asked, what can a company do to protect itself? That is not difficult. If Currier Lumber Company had kept complete records and was able to show that 8 or 10 of its employees did work all of their time on Weatherproof goods and that these plaintiffs couldn't have done much work if any on the goods which were sold in interstate commerce, there might be

some reason for this court to hold that the "de minimis non curat lex" doctrine might apply. But Currier cannot use its lack of proper records which the act makes it its duty to keep, to destroy plaintiffs' case on the plea that plaintiffs have not produced the complete proofs. Plaintiffs cannot produce proofs because Currier has not the records which are a charge upon Currier. One should not be permitted to profit by his own wrongful act. Section 11(c) of Fair Labor Standards Act 1938, 29 U.S.C.A. § 211(c); United States v. Darby, supra; Section 15(a) (5) Fair Labor Standards Act, 29 U.S.C.A. § 215(a) (5).

It will be remembered that 40 men have already recovered for the interstate commerce feature of defendant Currier Lumber Company's business. It is possible of course that the company was "forced to make a settlement" with some of its employees as the seeming lesser of two evils, but from the records before us it appears to this court that whether it was intentional or not intentional, there was no real segregation of the Weatherproof Company's mill employees. At least there is more real evidence to make this court believe that plaintiffs actually did some work each day each week on Weatherproof's out-of-state orders than there is to the contrary and we do so hold.

▮ We furthermore hold that it is immaterial whether these 37 men actually worked on the goods that were sent into the channels of interstate commerce from Weatherproof because under the Darby case, supra, since there was no segregation for intrastate consumption when the goods were made, and since the goods "might have gone" into interstate commerce, it is sufficient prima facie evidence which in the absence of direct proof to the contrary makes it reasonable to suppose, that the particular goods these plaintiffs worked on are more likely to have been part of the 70 percent sent out of the state than of the 30 percent sold intrastate. In fact, the possibility is more than two to one.

It is our further holding that since the testimony of the other plaintiffs will be practically the same as that of the witnesses so far heard, all plaintiffs shall be entitled to recover. We can see no other way of upholding the intents and purposes of the Fair Labor Standards Act which has a beneficial objective.