## HARRIS v. HAMMOND.
### Civil Action No. 176.

District Court, S. D. Georgia,
Augusta Division.
Aug. 11, 1943.

Paul T. Chance, of Augusta, Ga., for plaintiffs.

W. Inman Curry, of Augusta, Ga., for defendant.

LOVETT, District Judge.

By consent of the parties this case was heard by the court as trier of the facts.

My findings and conclusions follow.

### Facts.

The suit is by three former employees of defendant to recover unpaid minimum wages, overtime compensation, liquidated damages, attorney's fees and costs under the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 201 et seq.

Plaintiff McKey, who was paid $20 a week for his services, sues for overtime compensation, etc., from October 23, 1938, to December 24, 1939, alleging he worked 75 hours each week during that period. The plaintiff Harris, paid $11 per week for his services, alleges he worked 76 hours per week from October 23, 1938, to June 15, 1941. He sues for unpaid minimum wages, overtime, etc. Plaintiff McDaniel, paid $11 per week from October 23, 1938, to April 15, 1941, $15 per week from April 15, 1941, to March 25, 1942, and $20 per week from March 25, 1942, to August 1, 1942, sues for unpaid minimum wages, overtime compensation, etc.

The question is whether these employees are within the coverage of sections 6 and 7 of the Act.

Since 1931 the defendant has operated a grocery and feed business in Augusta, Georgia, a city on the state line between Georgia and South Carolina. There is a dispute between the parties as to whether he conducted a retail establishment or was a wholesale grocer. He sold and delivered some goods to customers in South Carolina, where he lived before he entered business in Augusta, Georgia.

The defendant's place of business is located on the first, or street level, floor of a 2-story brick building on the main business street in the retail district of Augusta. The second floor is given over to apartments where people dwell. The store is 30 or 40 feet wide and between 140 and 150 feet long. The front portion of it nearest the street, and extending 35 or 40 feet towards the rear, contains shelves, counters, display cases and racks, a cash register and the usual equipment found in a retail grocery store. Photographs in evidence disclose that it has large plate glass windows, in front of which on the sidewalk and behind which goods are displayed in the usual manner of a retail grocery store. A partition without a door, already in the building when the defendant rented the premises, separates the front end from the rear. The rear compartment is used as a warehouse and storage room, principally for grain, hay and other feed stuffs of that type. Entrance to the rear compartment is at or near the rear of the building. One entering the front door of the store from the street has a view of what would appear to be a retail grocery store.

No manufacturing, production or processing of goods for commerce is undertaken or done by the defendant. He does not even mix the feed which he sells.

During the years in controversy the gross sales of the defendant were between a minimum of $90,000 and a maximum of $105,000 per year. Less than 20% of the gross sales represent non-retail sales, or what the plaintiffs characterize as sales at wholesale. Not exceeding 15% or 20% represent sales of goods delivered to customers in South Carolina. According to statements made to credit agencies his stock of merchandise varied from $15,000 to $18,000. They reported him as both a retail and a wholesale grocer. His accounts receivable ran around $4,000. Among the principal customers of the defendant are dairymen, poultrymen and farmers owning cattle and live stock and who purchase feed stuffs in larger quantities than a retail grocery store ordinarily would sell. Some of these customers are in Georgia; some in South Carolina. Some South Carolina customers call at defendant's store and purchase and take delivery there, using their own trucks for the purpose. However, defendant operates one truck of his own—and only one. One day each business week he makes deliveries in South Carolina with this truck. No goods are shipped out by railroad. On the side of defendant's one truck is painted defendant's name, followed by the words "Wholesale Grocer". He also used stationery and invoices on which the words "wholesale grocer" appeared. Occasionally he and others in the retail grocery business pooled their purchases and bought in quantities, carload lots, using

his name to do so, and on arrival they parceled out the goods among themselves. All goods purchased came to rest in the warehouse portion of the store. They were not ordered on pre-existing contracts or understandings with customers in or out of the state, with the exception noted as to the pooling of purchases, though some of those from whom he bought were located and shipped the goods to him from without the state. On arrival he had no way of knowing whether the commodities he bought would be sold to any particular customer anywhere. He served the public and sold indiscriminately to any one willing to buy and who called at his store on the principle of first come first served. His business licenses from the state sometimes described him as a wholesale grocer and at other times simply as a grocer. In the City and telephone directories he was classified among the wholesale grocers. On the plate glass windows of his store appeared the words "L. C. Hammond & Company, Groceries and Feeds". There was also a sign extending over the sidewalk reading the same way. Between 100 and 150 customers daily during the week and on Saturdays about 500, admittedly buying at retail in small quantities, were served over the counter in the front end of the store. His customers in South Carolina at no time exceeded 40 or 50 people. Over a period of years, counting both old customers to whom he no longer sold and the new and current ones, the number was larger.

One of the plaintiffs, McKey, spent one day each week soliciting orders and making collections in South Carolina, and for the balance of the week he worked in the store either in the warehouse space or in what, for convenience, I shall call the retail department. He was not employed originally as a salesman to travel; he took over that work when the defendant himself had to give it up on account of ill health. Another, Harris, drove the truck for one day each week into South Carolina making deliveries of goods sold to customers there, and when not so engaged hauled goods in the truck from the railroad delivery tracks to the store and unloaded and handled goods in the warehouse department (some of which came from without the state) and carried packages from the retail department to the street curb to parked automobiles of customers. The third plaintiff, McDaniel, assisted the truck driver in the performance of his work. The truck driver and his helper when going into South Carolina would leave the store around ten o'clock in the morning and return by 3:30 or 4:00 o'clock in the afternoon, one day each week, usually on Wednesday, and en route to South Carolina would make deliveries in the state of Georgia if the business so required.

In 1939 or 1940 an inspector from the department of labor, wage and hour division, examined the defendant's records and inspected his store. He found the percentage of non-retail, or wholesale, business in dollars at that time less than 20% of the whole, and informed the defendant his business was not subject to the Fair Labor Standards Act, being exempt under section 13(a) (2), 29 U.S.C.A. 213(a) (2), as a retail establishment the greater part of whose selling was in intrastate commerce. A second inspector, coming in later, confirmed the earlier inspector upon finding the so-called wholesale sales had not increased.

## Discussion.

There are two questions for decision. The first is are these employees engaged in a retail establishment, the greater part of whose selling is in intrastate commerce, with respect to whom by section 13(a) (2) of the Act sections 6 and 7 are made inapplicable. Secondly, if they are not, if the defendant is a wholesaler, are these employees covered by the Act in all of their activities, were they wholly "in commerce" and entitled to invoke the Act for all of the services they rendered or only where the services had some immediate relationship to interstate commerce. Collaterally there is the question of where the burden of proof rests.

It should be noticed we are dealing here with one who neither manufactures nor produces goods for commerce. A producer under the Act is treated very differently from one who merely sells either at wholesale or retail. As to the manufacturer or producer Congress made no distinction as to the volume or amount or shipments in the commerce or of production for commerce by any particular shipper or producer, provided it was substantial. It recognized that in present day industry competition by small concerns may affect the whole, and that the total effect of the competition of many small producers may be great. United States v. Darby, 312 U.S. 100, 123, 657, 61 S.Ct. 451, 85 L.Ed. 609, 132 A.L.R. 1430; Davis v. Goodman Lbr. Co., 4 Cir., 133 F.2d 52, 53; Walling v. Peoples

Packing Co., 10 Cir., 132 F.2d 236, 237(6); Ling v. Currier Lumber Co., D.C., 50 F. Supp. 204; Samuels v. Houston, D.C., 46 F.Supp. 364, 366. It is different as to a retail establishment. By the express terms of the Act Congress said the provisions of sections 6 and 7 relating to minimum wages and overtime compensation should not apply with respect to "(2) any employee engaged in any retail or service establishment the greater part of whose selling or servicing is in intrastate commerce". Section 13(a) (2), 29 U.S.C.A. § 213(a) (2). As to wholesalers, all phases of their business selling intrastate are not necessarily covered by the Act because the purchases are made interstate. Walling v. Jacksonville Paper Co., 317 U.S. 564, 570, 571, 63 S.Ct. 332, 87 L.Ed. ——; Higgins v. Carr Brothers Co., 317 U.S. 572, 63 S.Ct. 337, 87 L.Ed. ——; Reuter, Inc., v. Walling, 5 Cir., 137 F.2d 315, decided July 22, 1943. "We cannot be unmindful that Congress in enacting this statute plainly indicated its purpose to leave local business to the protection of the states. * * * Moreover as we stated in Kirschbaum v. Walling, supra, 316 U.S. [517], 522, 523, 62 S.Ct. [1116], 1119, 1120, 86 L.Ed. 1638 Congress did not exercise in this Act the full scope of the commerce power. * * * There is, however, no indication in the legislative history that but for the exemption of retailers it was thought that all movement of goods from manufacturers to wholesalers and on to retailers would be 'in commerce' within the meaning of the Act, where the wholesalers and retailers were in the same state. It is quite clear that the exemption in § 13(a) (2) was added to eliminate those retailers located near the state lines and making some interstate sales. * * * And the exemption for retailers contained in § 13(a) (1) was to allay the fears of those who felt that a retailer purchasing goods from without the state might otherwise be included. * * * Hence we can not conclude that all phases of a wholesale business selling intrastate are covered by the Act solely because it makes its purchases interstate". Jacksonville Paper Company case, supra [317 U.S. 564, 63 S.Ct. 336, 87 L.Ed. ——].

Therefore, we first turn to a consideration of defendant's activities.

Was he in any true sense a wholesaler doing an interstate business.

■■■ To establish that he was the plaintiffs say he solicited retailers in South Carolina to buy goods from him one day each week; that he held himself out to some of his customers and to those from whom he bought as a wholesale grocer; his truck had those words painted on its sides; he was so listed in the telephone and city directories; his stationery and invoices so claimed—and that these facts are undisputed. On the other hand, when we consider the kind of store he operated, its appearance, customers, etc., the volume of his business, the amount of his inventory, the accounts receivable, etc., together with the fact that his quantity sales were less than 20% of his total sales, it seems reasonably clear to me that in no genuine sense was he a wholesaler. Certainly his total quantity sales, and particularly his sales outside of the state, could not have kept him in business very long unless he had his sales at retail to add to them. The evidence is silent as to prices charged in cases where sales were made in quantity or at wholesale. It is fair to assume that some discount was allowed, but it is also conceivable that the customers in South Carolina may have been willing to pay Augusta retail prices if deliveries were made to their doors without cost to them. The defendant undoubtedly posed as a wholesaler in some relationships and for some purposes. I am inclined to think this he did in order to buy more cheaply rather than to sell to those who sell again, which is the ordinary test for determining if one is a wholesaler. It is the business activities, not what he calls himself, that should control. See White Motor Co. v. Littleton, 5 Cir., 124 F.2d 92; Prescription House, Inc., v. Anderson, D.C., 42 F.Supp. 874; Duncan v. Montgomery Ward & Co., D.C., 42 F. Supp. 879; Snavely v. Shugart, D.C., 45 F.Supp. 722; Zehring v. Brown Materials, D.C., 48 F.Supp. 740. When it is remembered that all of the quantity sales of defendant in South Carolina were within a few miles of the city of Augusta, Georgia, within what might be called its retail trade territory, more or less in the same section from which he originally came and where his personal friends doubtless resided, that in the beginning and before the plaintiff McKey was employed the defendant himself personally drove his automobile one day each week into that trade territory and saw his customers in person, that he did not employ the plaintiff McKey in the beginning as a salesman or solicitor and only because of the ill health of the defendant himself did McKey take over that

work, that the volume of such business was relatively small in dollar values, it seems clear to me that the quantity sales interstate were merely incidental to defendant's intrastate business, which intrastate business was predominantly the thing out of which he made his living.

Were the plaintiffs engaged in a retail establishment? If so, they can not invoke the Act, for clearly by the dependable evidence it was shown the greater part of the selling by the establishment was intrastate.

■ If we look to the Interpretative Bulletins of the Administrator set up by the Act (Bulletin No. 6, June 1941) as an aid to the determination, which we may do not as conclusive but as having persuasive value because it is a contemporaneous construction by an officer charged with enforcement of the Act (United States v. American Trucking Ass'ns, 310 U.S. 534, 540, 60 S.Ct. 1059, 84 L.Ed. 1345; Walling v. American Stores Co., 3 Cir., 133 F.2d 840, 843), we find the physical appearance and equipment of defendant's store as well as his manner of selling over the counter squarely within his description of a retail establishment. See Pars. 9 to 14.

The volume of sales retail and non-retail also bring him within the exemption according to the Administrator's bulletin. It is there said (par. 18): "For purposes of enforcement the Administrator will ordinarily consider the non-retail selling of an establishment to be substantial if the gross receipts from such selling constitute more than one quarter (25 per cent) of the total gross receipts of the establishment". Feed establishments selling in large quantities and at a discuont from the regular retail price are considered in the Bulletin (pars. 63 and 64). The Administrator applies the same 25% test to determine if their non-retail sales are substantial. He says: "In some cases, however, an establishment sells feed, hay, fertilizer etc in large quantities and at a discount from the regular discount price. For example, feed is sold to feed stores, large commercial poultry and dairy farmers, urban users of horse feeds, non-farming feeding and fattening stations. In the ordinary case these sales are not retail sales, and if such sales constitute a substantial portion of the selling * * * it may not be considered a retail establishment under the exemption. See par. 18 (the 25% par.) for a discussion of 'substantial' ". (Emphasis mine)

Some of our courts have reached the same conclusion where the non-retail or wholesale sales were casual, incidental or unsubstantial only. Prescription House v. Anderson, Duncan v. Montgomery Ward & Co., and White Motor Co. v. Littleton, supra. See, also, Stucker v. Roselle, D.C., 37 F.Supp. 864, 865 (8, 9), 867; Moses v. McKesson & Robbins, D.C., 43 F.Supp. 528(2), 529. The only reported case where a different view was entertained seems to be Petway v. Dobson, 43 F.Supp. 277, by District Judge Davies of the Middle District of Tennessee. Some of the facts are strikingly like the case at bar. But there are also differences. Unlike here it was admitted that the larger proportion of defendants' business was in interstate commerce, and twenty five percent of the total sales made were wholesale. Here the ratio is much lower.

The plaintiffs were engaged in a retail establishment the greater part of whose selling was in intrastate commerce.

■ This opinion might well end here. But there are other aspects of the case which for future guidance of the parties properly may be discussed briefly. One of them relates to the over-time compensation claimed by the truck driver and his helper while engaged in hauling goods from the railroad to defendant's warehouse, some of the goods coming from outside of the state. While so engaged for a substantial portion of their time, if the defendant had been a wholesaler, they would have been engaged in interstate commerce and within the coverage of the minimum wage provision of the Act but without the overtime provisions. Jax Beer Co. v. Redfern, 5 Cir., 124 F.2d 172, 174; Walling v. Goldblatt Bros., 7 Cir., 128 F.2d 778(6), 782; Southland Gasoline Co. v. Bayley, 63 S.Ct. 917, 87 L.Ed. ——, decided May 3, 1943; Walling v. Silver Bros. Co., 1 Cir., 136 F.2d 168, decided May 21, 1943; Reuter v. Walling, supra. How much of their time, however, was given to such hauling has not been shown. Where an employee works both interstate and intrastate he must point out what part of his work is given to each. Super-Cold Southwest Co. v. McBride, 5 Cir., 124 F.2d 90(5), 92; Snavely v. Shugart, supra; Samuels v. Houston, D.C., 46 F.Supp. 364, 367; Bracey v. Luray, D.C., 49 F.Supp. 821(9). On the other hand, if the defendant had been a wholesaler, and these employees during a given work week

interchangeably engaged in work in a department involving only intrastate business and in another involving interstate commerce (even if it could be found here the business was sufficiently departmentalized as to segregate the two departments, which I think has not been shown) the employer would have been required to pay the wages prescribed by the Fair Labor Standards Act for the entire time worked, including time spent in the department involving intrastate business alone. Fleming v. Knox, D.C., 42 F.Supp. 948; Ling v. Currier Lbr. Co., supra.

Conclusions.

1. The court has jurisdiction of the parties and the subject matter under section 16(b) of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 216(b).

2. By the express terms of section 13(a)(2) sections 6 and 7 of the Act are not applicable to the plaintiffs.

3. Judgment shall be for defendant. Let it be presented on notice.